GORDON A. ERICKSON AND OLIVE L. ERICKSON, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

W. WAYNE SKINNER AND PAULINE E. SKINNER, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 684–70, 956–70. Filed August 19, 1971.

*Milton R. Abrahams*, for the petitioners in docket No. 684–70.
*Tyler B. Gaines*, for the petitioners in docket No. 956–70.
*Ronald M. Frykberg*, for the respondent.

DAWSON, *Judge:* In these consolidated cases respondent determined the following Federal income tax deficiencies:

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| Gordon A. and Olive L. Erickson | 684–70 | 1965 | $8, 415. 69 |
| W. Wayne and Pauline E. Skinner | 956–70 | 1965 | 16, 631. 88 |

In docket No. 684–70 certain uncontested adjustments can be given effect in the Rule 50 computation.

The controversy in these proceedings arises out of an agreement dated April 12, 1965, between Gordon A. Erickson and Mid-States Construction Co., a subchapter S corporation, providing for the re-

demption of Erickson's stock for a determined price, with an upward or downward adjustment of the price depending upon whether the final profits of one construction job then in progress were more or less than the amount estimated at the time of the agreement. The parties to the agreement reported the transaction inconsistently on their respective Federal income tax returns. Erickson reported the gain realized by him in connection with the redemption of his stock as long-term capital gain. The company on its tax return treated $13,040 of the amount as a dividend distribution and $30,992 thereof as a joint venture distribution. Respondent, as a revenue protective measure, made inconsistent deficiency determinations against the Ericksons and the Skinners. He seeks the proper tax treatment of the respective petitioners consistent with the facts and law pertaining to the transaction. Thus the issue presented for decision is whether the amounts of $13,040 and $30,992 paid to Gordon Erickson by Mid-States Construction Co. were paid as parts of the total payment for the redemption of Erickson's stock or as dividend and joint venture distributions.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Gordon A. Erickson and Olive L. Erickson are husband and wife whose residence was Omaha, Nebr., on the date of filing their petition herein. Their joint Federal income tax return for the taxable year 1965 was filed with the district director of internal revenue at Omaha, Nebr.

W. Wayne Skinner and Pauline E. Skinner are husband and wife whose residence was Omaha, Nebr., on the date of filing their petition herein. Their joint Federal income tax return for the taxable year 1965 was filed with the district director of internal revenue at Omaha, Nebr.

Olive L. Erickson and Pauline E. Skinner are parties hereto solely by reason of having filed joint income tax returns with their husbands. The husband-petitioners will sometimes hereinafter be referred to as Erickson and Skinner.

Mid-States Construction Co. (herein sometimes referred to as either Mid-States or the company) is a corporation organized under the laws of the State of Nebraska. On or about December 24, 1959, it filed an election to be treated as a small business corporation under the subchapter S provisions of the Internal Revenue Code (secs. 1371–1379), which election was in effect at all times material herein. Mid-States filed its U.S. Small Business Corporation Return of Income (Form 1120–S) for the calendar year 1965 with the district director of internal revenue at Omaha.

Mid-States was incorporated on April 6, 1959. Upon incorporation the company had 700 shares of stock issued and outstanding which were owned as follows:

| Stockholder | Number of shares |
|---|---|
| Erickson | 250 |
| Skinner | 250 |
| Parr | 100 |
| Russell | 50 |
| Casey | 50 |

Since its incorporation Mid-States' principal business activity has been the construction of concrete grain-storage elevators and feed mills.

During 1961 Parr's 100 shares were redeemed by Mid-States and thereafter held as treasury stock.

Prior to 1965 Skinner was the president of Mid-States and Erickson was secretary-treasurer. Both were directors of the corporation.

Late in December 1964, and during the early months of 1965, discussions were held between Erickson and Skinner regarding Erickson's desire to separate from the company by selling his stock or, in the alternative, buying Skinner's stock. Various proposals were discussed, including one whereby Erickson would sell his stock to the company for 85 percent of its book value. Such proposal was not consummated because the company was unwilling to pay the full price in cash but instead wanted to make partial payment for the stock by the assignment of certain notes receivable held by the company which had been received in payment for some construction jobs. During the various discussions Erickson was represented by his attorney, Milton R. Abrahams, and Mid-States was represented by its attorney, Harry B. Otis.

On April 12, 1965, an agreement was reached by and between Erickson and Mid-States Construction Co. That agreement provided as follows:

THIS AGREEMENT made and entered into this 12 day of April 1965 by and between GORDON A. ERICKSON, hereinafter called "Erickson", and MID-STATES CONSTRUCTION CO., a Nebraska corporation, hereinafter called "the company", WITNESSETH:

WHEREAS, the company now has issued and outstanding 600 shares of fully paid and non-assessable common stock, of which 250 shares are owned and held by Erickson and represent his entire stock interest in the company;

WHEREAS, Erickson desires to sever his relationship with the company as such stockholder and as an officer and director thereof and to sell and transfer all of such stock to the company, and the company is willing to redeem such stock, upon the terms and conditions hereinafter set forth; and

WHEREAS, all of the stockholders of the company have duly consented to such redemption at an adjourned annual meeting of stockholders.

Now, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

1. Subject to and in accordance with the terms and conditions of this agreement, Erickson agrees to sell to the company and the company agrees to buy from Erickson the aforementioned 250 shares of its common stock now owned by him for a redemption price of $146,479.00 to be paid as hereinafter provided, subject, however, to adjustment in accordance with the provisions of paragraph 4 hereof. Such price represents (a) 41⅔% of the net book value of the company's property and assets as reflected by the company's balance sheet as at the close of business on December 31, 1964, prepared and certified by Haskins & Sells, independent certified public accountants, plus (b) 41⅔% of the net income of the company for the month of January, 1965. A copy of such balance sheet is attached hereto, marked Exhibit A and by this reference made a part hereof.

2. The company shall pay such redemption price to Erickson in the following manner:

(a) The sum of $80,500.00 by assigning and transferring to him without recourse certain receivables of the company in the aggregate face amount of $80,500.00 and identified and described by job locations on the company's records as the Watertown, Wisconsin note and mortgage, $60,000.00; the Goodfield, Illinois note, $11,500.00; and the Storm Lake, Iowa note, $9,000.00;

(b) The sum of $7,529.00 by transferring and delivering to Erickson in kind one-half (½) of the furniture, fixtures, machinery and equipment of the company, the items to be transferred and delivered pursuant hereto having a book value of $7,529.00; and

(c) The balance of $58,450.00 by payment thereof in cash.

3. For the purpose of determining the items of furniture, fixtures, machinery and equipment to be transferred and delivered to Erickson as hereinbefore provided, he has prepared and furnished to the company two (2) separate schedules, each purporting to list one-half (½) of such items. By agreement of the parties, the company has selected and is to retain as its own property the items listed in one of such schedules and is to transfer and deliver to Erickson the items listed in the other schedule.

4. Upon the completion of the construction job at Kirksville, Missouri, hereinafter called "the Kirksville job", the net profit realized therefrom by the company may be more or less than the amount of such profit reflected on the company's books as at January 31, 1965, namely $52,780.00. Accordingly the redemption price shall be subject to adjustment upon the completion of the Kirksville job either by further payment to Erickson by the company of an amount equal to 41⅔% of any such additional profit or by reimbursement by Erickson to the company of an amount equal to 41⅔% of any reduction in such profit, as the case may be. Erickson shall continue to supervise the Kirksville job until the completion thereof, shall make such trips to Kirksville and perform such services as may be necessary for the supervision of the job, all at his own expense without charge to the company, and shall be furnished by the company with all files, records and papers required in connection with the supervision of the job.

5. Since December, 1964 Erickson has devoted part of his time to another business but has received his regular salary and expense allowance from the company, subject to subsequent adjustment by the parties. For the purpose of such adjustment Erickson shall pay the company and the company shall accept a cash refund in the amount of $1,000.00 in full payment, satisfaction and discharge of all claims or demands of the company against Erickson for overpayment of salary or expense allowance to him.

6. The closing under this agreement shall take place at 11:00 o'clock A.M. on April 12, 1965 or such earlier or later time or date as may be mutually fixed by the parties. The place of closing shall be the office of the company at 8827 Maple Street, Omaha, Nebraska or such other place as may be mutually agreed upon. At the closing, (a) the company shall execute and deliver to Erickson such bills of sale, assignments, instruments and documents as shall be effective to transfer to Erickson all the receivables, furniture, fixtures, machinery and equipment mentioned in paragraph 2 hereof and shall pay to Erickson by check the sum of $54,450.00 (the balance of $4,000.00 being retained by the company pursuant to the provisions of paragraph 7 hereof) ; and (b) Erickson shall deliver to the company certificates for said 250 shares of stock, duly endorsed for transfer, shall tender to the company his written resignation as a director, officer and employee thereof, shall surrender to the company such company-owned items as may still be in his possession or under his control such as credit cards, keys and other paraphernalia, and shall pay to the company by check said refund of $1,000.00.

7. The company has set apart out of said redemption price and shall retain the sum of $4,000.00 until final payment for the Kirksville job. Upon receipt of such payment, the company shall pay over such sum to Erickson, subject, however, to the adjustment, if any, mentioned in paragraph 4 hereof.

8. After the closing, each party shall from time to time upon the reasonable request of the other party execute and deliver in proper form such further instruments and documents and performing such acts as may be necessary or desirable for perfecting in the other party title to all items intended to be transferred pursuant hereto and putting such party in actual possession thereof.

9. The company has been holding in reserve the sum of $3,000.00 to defray the cost of further painting on the Litchfield, Illinois and Greensburg, Indiana jobs. Such sum is included in the redemption price payable to Erickson hereunder, and he shall arrange for such painting at his own expense.

10. Attached hereto as Exhibit B is a list of all of the company's construction jobs since the organization of the company. Each job is identified in the gross profit column by an "E" or an "S" according to whether Erickson or W. Wayne Skinner, the president of the company, supervised such job. With respect to each job marked "E" Erickson shall have the following obligations and responsibilities :

(a) If at any time prior to January 1, 1967 in the case of each job, except the Kirksville, Litchfield and Greensburg jobs hereinbefore mentioned, and if at any time prior to January 1, 1969 with respect to such jobs, the owner for whom any such job was performed shall claim that there was any defect in materials or workmanship under normal use and service, Erickson shall at his own expense remedy such defect within a reasonable time after he receives written notice of such claim from the company.

(b) Erickson shall have the obligation and responsibility for remedying such defect regardless of the amount of time that has elapsed since the completion of the job or the fact that such claim may be barred by the statute of limitations, all to the end that the good will and reputation of the company may be preserved.

(c) In the event that Erickson fails or refuses thus to remedy any such defect he shall indemnify the company and hold it harmless from and against any and all loss, liability and expense resulting from or arising out of any such claim of defective materials or workmanship.

(d) In the event that Erickson fails or refuses thus to remedy any such defect, the company may itself remedy such defect after first notifying Erickson of the company's intention to do so, and Erickson shall reimburse the company for the amounts actually expended by it for that purpose.

11. The company shall retain and make available to Erickson at his request such books, records, files, drawings, papers and documents as he may require for the purpose of collecting the receivables mentioned in paragraph 2 hereof or performing his obligations and responsibilities under paragraph 10 hereof.

12. This agreement may not be modified or terminated orally and no modification, termination or attempted waiver shall be valid unless in writing signed by the party against whom the same is sought to be enforced.

13. The provisions of this agreement shall be binding upon, inure to the benefit of and apply to the respective heirs, executors, administrators, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date first above written.

The written agreement was drawn on behalf of the parties through the joint efforts of Erickson's attorney, Milton R. Abrahams, and Mid-States' attorney, Harry B. Otis.

Attached to the agreement was a Mid-States balance sheet at January 31, 1965, showing "net common stock and earned surplus" of $294,287.76. At the time of the agreement Erickson owned 250 of Mid-States' 600 shares, or 41⅔ percent.

The "redemption price" of $146,479 set forth in paragraph 1 of the agreement represented the following (figures rounded to nearest dollar):

| | | |
|---|---|---|
| 41⅔% of net book value of stock at Jan. 31, 1965 ($294,287.76) | | $122, 620 |
| 41⅔% of the Kirksville job profits at Jan. 31, 1965, in the amount of $52,780, as provided in par. 4 of the agreement | | 21, 992 |
| Cash adjustment between Erickson and Mid-States Construction Co.: | | |
| Payable to Erickson: | | |
| Litchfield, Ill., and Greensburg, Ind., paint jobs | $3, 000 | |
| Office equipment allowance | 367 | |
| | 3, 367 | |
| Payable to Mid-States Construction Co.: | | |
| Refund of salary and expense allowance | 1, 000 | |
| Equipment allowance (yokes) | 100 | |
| ½ of accountant's fees for audit preceding agreement | 400 | |
| | 1, 500 | |
| Net cash adjustment—payable to Erickson | | 1, 867 |
| | | 146, 479 |

Pursuant to the agreement, Erickson on April 12, 1965, delivered certificates for the 250 shares of common stock of Mid-States owned

by him, duly endorsed, to the company and received the following from the company on the dates indicated:

| | | | | |
|---|---|---|---:|---:|
| Apr. 12, 1965 | Cash | | | $54, 450. 00 |
| Apr. 12, 1965 | Notes receivable: | | | |
| | Watertown, Wis., note and mortgage | $60, 000 | | |
| | Goodfield Ill., note | 11, 500 | | |
| | Storm Lake, Iowa, note | 9, 000 | | 80, 500 |
| Apr. 12, 1965 | Furniture, fixtures, machinery, and equipment | | | 7, 529 |
| Nov. 19, 1965 | Cash | | | 4, 000 |
| Nov. 19, 1965 | Cash | | | 9, 000 |
| | | | | 155, 479 |

The November 19, 1965, payment to Erickson by Mid-States in the amount of $4,000 represented the part of the "redemption price" retained by the company until final payment for the Kirksville job, as provided in paragraph 7 of the agreement.

The November 19, 1965, payment in the amount of $9,000 represented an additional payment to Erickson by the company. The payment was made pursuant to the provisions of paragraph 4 of the agreement. In paragraph 4 it was recognized that the net profit to be realized from the Kirksville, Mo., construction job might be more or less than the estimated profit of $52,780. Accordingly, paragraph 4 provided that the redemption price was subject to adjustment upon the completion of the Kirksville job, either by further payment to Erickson by the company of an amount equal to 41⅔ percent of any additional profit or by reimbursement by Erickson to the company of an amount equal to 41⅔ percent of any reduction in profit, as the case might be. As it turned out, the total profit from the Kirksville job was $77,632, or $24,852 in excess of the estimated profit of $52,780. Because of certain minor items of disagreement, which arose between Erickson and the company, Erickson settled for $9,000 as the additional amount due him for redemption of his stock under paragraph 4 of the agreement. On the reverse side of the company's check to Erickson in the amount of $9,000 is typed the following:

Accepted in full payment of undivided profits in Kirksville, Mo. job per certain agreement dated April 12, 1965.

G. A. Erickson

Erickson endorsed the check in the space provided.

Other than supervising the completion of the Kirksville job, as provided in paragraph 4 of the agreement, and fulfilling any repair-of-

defect or bonding responsibilities that might arise under paragraph 10 of the agreement with respect to completed jobs that had been previously supervised by him, Erickson separated from Mid-States as of April 12, 1965, when he resigned as a director, officer, and employee of the company. A few months prior to April 12, 1965, Erickson had organized a new company, Mid-States Equipment Co., the operation of which was then and thereafter under his direction.

The $54,450 payment made by Mid-States to Erickson on April 12, 1965, was reflected in the cash disbursements journal of the company by an entry crediting a "cash" account and debiting the "Treasury stock" account (account No. 252) in the amount of $54,450.

Under date of April 30, 1965, the following general journal entry was made on the books of Mid-States Constrution Co.:

| | | Account No. | Debit | Credit |
|---|---|---|---|---|
| G.E. transaction | Treas. stock | 252 | $93,550.00 | |
| | Depr. on car | 140 | 432.88 | |
| | Mach., Equip | 141 | 12,899.96 | |
| | Furn., Fixtures | 142 | 1,561.24 | |
| | Notes rec | 106 | | $80,500.00 |
| | Car | 130 | | 2,968.33 |
| | Mach. & equip | 131 | | 17,750.44 |
| | Furniture | 132 | | 2,225.31 |
| | Ac. payable | 205 | | 4,000.00 |
| | Off. salary | 20 | | 700.00 |
| | Travel exp | 25 | | 300.00 |

The $54,450 and $93,550 entries were reflected as debits in the Treasury stock ledger account of the company, so that the account was thereby increased in the amount of $148,000. On May 31, 1965, the Treasury stock account was credited in the amount of $3,000, to reclassify such amount which pertained to paragraph 9 of the agreement between Erickson and the company regarding certain painting to be done by Erickson in connection with jobs at Litchfield, Ill., and Greensburg, Ind. Subsequently, under date of November 30, 1965, three entries were made to the Treasury stock ledger account: a debit in the amount of $34,000 and credits in the amounts of $21,992 and $9,000. The debit entry was to reflect, in part, the $25,000 payment to Erickson for the redemption by the company of 50 shares of stock previously owned by Russell. The remaining portion of the entry in the amount of $9,000 is unexplained and may have been in error. The credit entry in the amount of $21,992 was made to reverse, in part, the earlier classification of payments to Erickson as being for Treasury stock. The $9,000 credit entry may have been connected with a reclassification of an entry to reflect the $9,000 cash payment to Erickson on Novem-

ber 19, 1965, or may instead have been to correct the possible error in connection with the $34,000 debit.

On December 31, 1965, the outstanding stock of Mid-States was owned as follows:

| Stockholder | Number of shares owned |
|---|---|
| W. Wayne Skinner | 250 |
| John P. Casey | 50 |

Attached to Mid-States' Small Business Corporation Return for 1965 (Form 1120–S) were schedules reflecting the following:

LINE 10—Page 1

Construction jobs transferred to joint venture per stockholders' agreement dated April 12, 1965

Income:

Profit in process at 1/31/65:

| | |
|---|---|
| Roseland contract (Nebraska) | $1, 315. 09 |
| Lincoln contract (Nebraska) | 4, 893. 55 |
| Kirksville contract—Gross billings | 308, 082, 64 |
| | 314, 291. 28 |
| Less direct costs—Kirksville contract (Missouri) | 230, 450. 87 |
| | 83, 840. 41 |
| Net joint venture profit | 83, 840. 41 |
| Less cash distributed as share of profits to Gordon A. Erickson, Omaha, Nebr. (477–14–8204) | 30, 992. 00 |
| | 52, 848. 41 |

CONTINUATION OF SCHEDULE OF DISTRIBUTION OF INCOME

| | | Total dividends or distribution | Amount taxable as ordinary income | Dividends entitled to exclusion | Previously taxed undistributed income | Stock redemption |
|---|---|---|---|---|---|---|
| 4/12/65 | Cash distributed to G. A. Erickson $52,450 less joint venture distribution of $30,992.[1] | $21, 458 | $13, 040. 00 | | $8, 418, 00 | |
| 4/12/65 | Other property distributed to G. A. Erickson at fair market value. | 88, 550 | | $15, 896. 67 | 72, 407. 61 | $245. 72 |
| 9/25/65 | Cash distribution to W. W. Skinner. | 7, 500 | 4, 622. 15 | | 2, 877. 85 | |
| 9/25/65 | Cash distribution to John P. Casey. | 1, 500 | 924. 45 | | 575. 55 | |
| 9/25/65 11/30/65. | Cash distribution to W. R. Russell. | 26, 500 | 924. 45 | | 16, 124. 08 | 9, 451. 47 |
| 11/19/65 | Cash distribution to G. A. Erickson | 13, 000 | | | | 13, 000. 00 |
| | Totals | 158, 508 | 19, 511. 05 | 15, 896. 67 | 100, 403. 09 | 22, 697. 19 |

[1] Distribution of profits per agreement dated 4/12/65:

| | |
|---|---|
| Profit for month of January 1965 | $31, 296. 52 |
| Distribution: | |
| 41⅔% of $31,296.52 earnings and profits | 13, 040. 00 |
| Joint venture profits—see schedule | 30, 992. 00 |
| Total distributed earnings and profits to G. A. Erickson | 44, 032. 00 |

Mid-States deducted the amount of $30,992 in arriving at the amount of taxable income shown on its return. The amount of $13,040 was treated on its return as having been paid to Erickson as a dividend distribution of earnings and profits out of its reported taxable income of $19,511.05.

On his individual return for 1965, Skinner reported the amount of $4,622.15 as his share of the $19,511.05 reported as taxable income on Mid-States' return.

In his statutory notice of deficiency to Skinner, respondent determined that the $30,992 amount was paid by Mid-States to Erickson for redemption of Erickson's stock and was not deductible in determining taxable income of the corporation. The amount of $30,992 was added to the reported taxable income of $19,511.05, for a revised taxable income of $50,503.05. As a part of respondent's determination, the $13,040 amount was found to also have been paid for the redemption of Erickson's stock, so that such amount did not reduce the amount of taxable income to be distributed to the company's remaining shareholders on December 31, 1965. Of the $50,503.05 revised taxable income, $40,835.88 was determined to be Skinner's share, which represented the $7,500 in dividends paid to him by the company on September 25, 1965, plus $33,335.88, or 5/6 (250 of 300 shares) of the company's undistributed taxable income in the amount of $40,003.05 ($50,503.05 less actual dividends on September 25, 1965, in the amounts of $7,500, $1,500, and $1,500 to Skinner, Casey, and Russell, respectively).

In his income tax return for 1965, Erickson reported on Schedule D the amount of $142,479 as the gross sales price of the 250 shares of stock redeemed by the company on April 12, 1965. Such amount represented the $155,479 paid to him by Mid-States pursuant to the agreement, less $3,000 for the paint jobs referred to in paragraph 9 of the agreement and less $10,000 for the difference between the $60,000 face amount of the Watertown, Wis., note received under paragraph 2 of the agreement and the $50,000 for which it was sold later in the year by Erickson.

In his statutory notice of deficiency mailed to Erickson, respondent determined that the amounts of $13,040 and $30,992 were paid to Erickson by Mid-States as distributions of profits taxable as ordinary income.

## ULTIMATE FINDINGS

The purpose of the April 12, 1965, agreement between Erickson and Mid-States was to provide for the redemption of Erickson's stock. The $13,040 and $30,992 amounts in issue were paid to Erickson as parts of the total purchase price for the redemption of his stock. The provi-

sions in the agreement pertaining to an upward or downward adjustment in the redemption price, depending upon whether the final Kirksville job profits were more or less than the amount estimated at the time of the agreement, were included solely to measure what the ultimate redemption price would be. The amounts in question were not paid to Erickson as dividend or joint venture distributions.

Since the $13,040 and $30,992 amounts were paid for the redemption of stock, Mid-States is not entitled to treat the $13,040 as a dividend distribution and deduct the $30,992 from taxable income as a joint venture distribution. Skinner's share of the company's taxable income for 1965 should be increased by the amount of $36,213.73. Correspondingly, the gain realized by Erickson in connection with the redemption of his stock qualifies for long-term capital gain treatment.

OPINION

The narrow issue presented is whether certain amounts received by Erickson from Mid-States in 1965 should be taxed to him as capital gain from the redemption of stock or as ordinary income from dividend or joint venture distributions. If the amounts are taxable as a capital gain to Erickson, then the taxable income of the company and Skinner's share thereof were properly determined by respondent in the manner prescribed by section 1373, I.R.C. 1954. The resolution of this issue turns upon the true nature and meaning of the agreement of April 12, 1965, with the company.

The positions of Erickson and Skinner are antithetical. It is Erickson's position that the agreement provided solely and exclusively for the redemption of his stock. This is also the view taken by respondent in his briefs. It is Skinner's contention that the agreement actually involved two different transactions: (1) The redemption of Erickson's stock for a redemption price of $109,580 representing approximately 41⅔ percent of the net book value of the company's assets as of the close of business on December 31, 1964, and (2) the creation of a joint venture between Erickson and the company with respect to its profits for January 1965 and the profits from the Kirksville job. Skinner recognizes that a redemption occurred but seeks to segregate and exclude part of the redemption price specified in the agreement. Skinner argues in his brief:

The contract primarily dealt with a redemption; the phrase "redemption price" refers to the actual redemption price, of course. But it covers more, and accordingly should be treated as the equivalent of "total" or "contract price." The fact that the parties felt it necessary to define the elements of the price is evidence of this, because if it was intended that all payments were to be strictly applied to the stock redemption, no explanation would have been necessary.

At the outset we note that the redemption price was not required to be paid in a lump sum or fixed amount in order to qualify as a capital gain but could be a percentage of profits. *Rose Marie Reid*, 26 T.C. 622, 632 (1956) ; *United States* v. *Yerger*, 55 F. Supp. 521 (E.D. Pa. 1944).

In our opinion Erickson's position is correct. The agreement itself refutes Skinner's claim that it provides for both a stock redemption and a joint venture. It speaks only in terms of a stock redemption and contains the usual provisions required for that purpose. The instrument does not even suggest, much less show, that a joint venture was ever contemplated or that anything beyond a stock redemption was involved. Nothing in the agreement lends color or sanction to Skinner's contention.

Both the company and Skinner were represented by their own attorneys in the negotiation of the agreement. Furthermore, they had the experience of an earlier transaction in which the company had redeemed stock that was thereafter held as treasury stock, with the remaining stockholders paying the income tax on the year's operations. If a joint venture had actually been intended with respect to the January 1965 profits or the profits from the Kirksville job, appropriate language could readily have been included in the agreement. It is simply barren of any reference, direct or indirect, to a joint venture. Moreover, the elements essential to the formation of a joint venture are not present here. See *Hyman Podell*, 55 T.C. 429, 431 (1970) ; *S & M Plumbing Co.*, 55 T.C. 702, 707 (1971).

There is no uncertainty or ambiguity in the wording of the agreement. Indeed, a careful examination demonstrates that its language is plain and explicit. The legal effect of the agreement is not left to conjecture but is clearly expressed in familiar terms. We are not concerned here with what the parties might or could conceivably have said, but what in fact they did say. They evidenced their intention by a written instrument which negates Skinner's thesis that there was a dual transaction—partly stock redemption and partly joint venture. This was an arm's-length transaction between businessmen who had previous experience in a similar transaction and who were represented by counsel. We cannot rewrite the agreement now just because, in retrospect, Skinner would have written it differently.

It is significant, we think, that until November 30, 1965, Skinner treated the agreement as one for the redemption of Erickson's stock. The consideration received by Erickson on April 12, 1965, under the agreement, including his precentage of the company's profits for the month of January 1965 and of its estimated profits from the Kirksville job up to January 31, 1965, was recorded as a debit in the company's

treasury stock account. This entry was consistent with the provisions of the agreement. Seven months later, on November 30, 1965, this entry was reversed. Skinner failed to offer any explanation for the manner in which the transaction was handled on the books of the company. Apparently, by November 30, 1965, he had reconsidered the tax implications of the original entry and decided to shift his position. In decisions analogous in principle to the instant situation the courts have dealt with the effect of similar conduct. See and compare *Natco Corporation* v. *United States*, 240 F. 2d 398, 402 (C.A. 3, 1956) ; *Holbrook* v. *United States*, 194 F. Supp. 252, 256, (D. Ore. 1961) ; and *Westbrook* v. *Masonic Manor*, 178 N.W. 2d 280, 282 (Neb. 1970).

Nowhere in his brief does Skinner offer any justification for reducing the stated redemption price to what he calls the "actual redemption price." Nor does he attempt to explain why the description of the redemption price in the second sentence of paragraph 1 of the agreement should somehow eliminate part of the price.

Erickson's stock was a capital asset, and upon the redemption the proceeds thereof were entitled to capital gain treatment. The redemption was completed on April 12, 1965. As required by paragraph 6 of the agreement, Erickson delivered to the company certificates for his 250 shares of stock, duly endorsed for transfer, tendered his resignation as a director, officer, and employee and surrendered the company-owned items still in his possession or under his control. It is immaterial that part of the redemption price represented a percentage of the January 1965 income and was subject to adjustment upon the completion of the Kirksville job. The entire redemption price, including the fixed percentage of income, was the consideration for the sale of a capital asset and hence was subject to capital gain treatment.

Mid-States filed an election to be treated as a small business corporation under the subchapter S provisions of the Internal Revenue Code (secs. 1371–1379), and the election was in effect during 1965.

Section 1373 (c) defines "undistributed taxable income" as "taxable income * * * minus * * * the amount of money distributed as dividends during the taxable year." See *Attebury* v. *United States*, 430 F. 2d 1162 (C.A. 5, 1970), and *George A. Roesel*, 56 T.C. 14 (1971), which outline and discuss the statutory framework of subchapter S. Distributions in exchange for stock are not deemed to be distributions "as dividends." Sec. 1.1373–1 (d), Income Tax Regs.

Example (5) of section 1.1373–1 (g), Income Tax Regs., is apposite to this controversy. It provides:

An electing small business corporation has taxable income and current earnings and profits of $100,000 for the taxable year. There are no accumulated earnings and profits as of the beginning of the taxable year. During the taxable year the corporation distributes $50,000 in a redemption that qualifies under sec-

tion 302(a). The undistributed taxable income of the corporation is $100,000. Since the current earnings and profits of $100,000 are first allocated to the constructive distribution of $100,000, that amount is includible in the gross income of the persons who were shareholders on the last day of the corporation's taxable year.

It is clear that the stock redemption effected by the April 12, 1965, agreement was one qualified under section 302(a) since it was substantially disproportionate and not essentially equivalent to a dividend.

The thrust of section 1373(c) and the regulations is succinctly summarized in 7 Mertens, Law of Federal Income Taxation, sec. 41B, p. 27 (1967 rev.) :

> Regardless of whether the distribution is in money or in kind, it does not reduce the amount of undistributed taxable income unless the distribution is taxable as a dividend. Thus, a money distribution may be taxable as a capital gain transaction resulting from a stock redemption, and therefore not be equivalent to a dividend, in which event it does not operate to reduce the amount of undistributed taxable income.

Only those persons who are shareholders of the corporation on the last day of its taxable year are required to include "the undistributed taxable income" in their income. Sec. 1373(b); sec 1.1373-1(a)(2), Income Tax Regs. If a shareholder sells his stock in a subchapter S corporation before the end of the corporation's year, he is taxed on no part of its "undistributed taxable income" for that year and his purchaser is taxed on all of it.

Applying these principles to the facts before us, we conclude that the taxable income of Mid-States for 1965 must include the $30,992 deducted as an alleged joint venture distribution, so that the company's revised taxable income is $50,503.05. Such taxable income less the $10,500 distributed as dividends during the taxable year ($7,500, $1,500, and $1,500 distributed to Skinner, Casey, and Russell, respectively, on September 25, 1965) results in "undistributed taxable income" of $40,003.05. The company's only shareholders on the last day of the taxable year were Skinner, owning 250 shares, and Casey, owning 50 shares. Therefore, 5/6 of the $40,003.05, or $33,335.88, must be allocated to Skinner as his share of the "undistributed taxable income" of the company. Such amount plus the $7,500 dividends paid to him, or $40,835.88, constitutes Skinner's ordinary income from Mid-States, as determined in the notice of deficiency mailed to Skinner.

Accordingly, we sustain respondent's determination against Skinner, and we reverse his determination against Erickson.

*Decisions in both docket numbers will be entered under Rule 50.*