HENRY H. RENARD AND RUTH RENARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Renard v. Commissioner
Docket No. 2650-69
United States Tax Court
T.C. Memo 1972-244; 1972 Tax Ct. Memo LEXIS 13; 31 T.C.M. (CCH) 1210; T.C.M. (RIA) 72244; December 11, 1972, Filed *13 Petitioner and Sidney B. Bette were the two equal shareholders of a Subchapter S corporation. Pursuant to an agreement executed on August 30, 1965, which was intended to carry out the provisions of a previously executed buy-sell agreement between them and the corporation and which called for the purchase price of the stock to be book value, Bette's stock was purchased by the corporation as of April 30, 1965. The total amount received by Bette was $122,025.46 plus 10 percent of the corporation's net profits for the 3 succeeding years. While the August 30, 1965 agreement referred to the $122,025.46 as the purchase price of the stock, the petitioner established that both he and Bette intended that $97,968.98 of that amount represented the unpaid portion of Bette's share of the corporation earnings for the period January 1 to April 30, 1965 and that Bette would be liable for the income taxes on said amount. Held: The common intent of adverse parties to an agreement having been established, the $97,968.98 is found to represent a dividend payment to Bette and not to be part of the purchase price of the stock, and hence the undistributed taxable income as defined in sec. 1373(c) is reduced *14 by $97,968.98. Sidney Bender, Aaron Lewittes and Howard Weitz, for the petitioners. Powell W. Holly, Jr. and Steedly Young, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined a deficiency in petitioners' Federal income tax and an addition to tax in the following amounts: Addition to tax Year
Deficiency
under Sec. 6653(a) [1]
1965
$64,618.59
$3,230.93
Due to concessions *16 the issues remaining for adjudication are: (1) Whether the undistributed taxable income for 1965 of Budd, a Subchapter S corporation, is reduced by a September 2, 1965 distribution. Such a determination necessitates a prior judgment relevant to the character of the distribution; that is, whether the disbursement qualifies as a complete redemption of stock or a partial dividend and a partial redemption. (2) Whether any portion of the asserted deficiency is due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, are incorporated herein by this reference. Henry H. Renard (hereinafter referred to as petitioner) and Ruth Renard are husband and wife and their legal residence was Yonkers, New York, as of the date their petition was filed with the Tax Court. Their joint Federal income tax return for the calendar year 1965 was filed on the cash basis with the district director of internal revenue, Manhattan district, New York, New York. *17 Budd Contracting Corporation (hereinafter referred to as Budd or the "Corporation") is a corporation formed, in 1932, under the laws of the State of New York, having its principal place of business in New York, New York. Since its incorporation Budd's predominant business activity has been as a general building contractor. The Corporation at all material times kept its books and filed its Federal income tax returns on the accrual method of accounting, adopting the calendar year as its accounting period. It filed its U.S. Small Business Corporation Return of Income (Form 1120-S) with the aforementioned district director for the calendar year 1965. From 1932 to September 1965 Sidney B. Bette (hereinafter referred to as Bette) was president and petitioner was secretary and treasurer of the Corporation. Petitioner became president in September of 1965. On January 11, 1962, the corporation through its accountant Alexander Gassman (hereinafter referred to as Gassman) filed an election to be taxed as a small business corporation, together with the consents to such election of Budd's two shareholders, petitioner and Bette. The Subchapter S election continued in effect through December 31, 1965. *18 At the time the corporation filed its election the two shareholders each owned 50 percent of the Corporation's outstanding stock. On May 8, 1962, Budd issued stock certificates numbers 3 and 4 to petitioner and Bette respectively, in the amounts of five shares each. [2]
Prior to the preparation of the Subchapter S election Gassman, a certified public accountant who served as accountant to petitioner and the corporation from at least 1934 through 1966, and as accountant to Bette from at least 1934 to sometime in 1965, explained to the shareholders the tax consequences of such election. Petitioner and Bette each complied with the applicable statutory provisions on their individual income tax returns for the years 1962 through 1964. In early 1962 Julian S. Bush (hereinafter referred to as Bush) an attorney, who was in the process of preparing an estate plan for petitioner, was retained by the Corporation to prepare a stockholder's agreement between the Corporation, petitioner and Bette. On April 4, 1962, the three interested *19 parties executed this agreement (hereinafter referred to as the "'62 agreement") which provided, among other things, for the future disposition of the Corporation's stock in case of death or permanent disability of either of the two shareholders. Such agreement provides in part as follows: AGREEMENT, made the 4th day of April, 1962, between HENRY H. RENARD and SIDNEY B. BETTE, hereinafter separately referred to as "Stockholder" and together referred to as "Stockholders", and by them with BUDD CONTRACTING CORPORATION, hereinafter referred to as the "Corporation", WHEREAS, the Stockholders are the owners of all the outstanding capital stock of the Corporation, and WHEREAS, the parties believe that it is in the best interests of the Corporation and the Stockholders to make provision for the future disposition of the shares of capital stock of the Corporation, IT IS, THEREFORE, AGREED, in consideration of the premises and the promises herein contained, as follows: A. DISPOSITION OF STOCK * * * 2. Purchase upon death. Upon the death of a Stockholder (hereinafter referred to as the "decedent"), all of the shares of the capital stock of the Corporation owned by him and to which *20 he or his personal representatives shall be entitled, shall be sold and purchase, as herein provided. (a) Obligation of Corporation to purchase. The Corporation shall purchase from the decedent's personal representatives and the decedent's personal representatives shall sell to the Corporation all of the shares of capital stock of the Corporation owned by the decedent and to which the decedent or his personal representatives shall be entitled, at the price and on the terms set forth in paragraph "4" hereof. * * * (c) Insufficiency of corporate surplus. If the Corporation shall not have sufficient surplus to permit it lawfully to purchase all of such shares of capital stock, the decedent's personal representatives and the other Stockholder shall promptly take such measures to vote their respective holdings of the shares of capital stock to reduce the capital of the Corporation or to take such other steps as may be appropriate or necessary in order to enable the Corporation lawfully to purchase and pay for all the decedent's shares of capital stock, including, by way of illustration and not by way of limitation, an up-to-date appraisal of the assets of the Corporation. If the Corporation *21 shall, nevertheless, be unable or refuse to purchase all of the decedent's shares of capital stock, the obligation of the Corporation with respect to the shares which the Corporation shall be unable or refuse to purchase shall be deemed assumed by the surviving Stockholder. 3. Purchase upon disability. (a) If either Stockholder shall, during the period of his employment by the Corporation hereunder, become permanently disabled (by physical or mental illness, or by a combination thereof) to the extent that he shall be, and continue to remain, unable substantially to perform the duties theretofore performed by him as officer and employee of the Corporation and to participate actively in its affairs, then the shares of capital stock of the Corporation owned by him shall be purchased and sold in the same manner as if such Stockholder had died except that the closing of such purchase shall take place six (6) months after the determination of such disability, as provided below, and all payments due to said disabled party, so long as he survives, shall be made to him. * * * 4. Purchase price. (a) The purchase price of the shares of capital stock of a Stockholder hereunder shall be: *22 (1) Their book value as of the date of offer, disability or death, as the case may be, as determined by the accountant or accounting firm then servicing the Corporation. Such determination shall be made in advance with sound accounting practice except that no allowance of any kind shall be made for good will, trade name or any similar intangible asset; (2) Ten percent (10%) of the net profits of the business, if any, in each of the three (3) succeeding calendar years commencing with the year in which the closing date of sale occurs (unless such closing shall be after June 1, in which event said three (3) years shall commence on the following January 1), which payments shall be deemed to be made for the good will of the Corporation attributable to said shares of stock. Such determination shall be made in accordance with sound accounting practice and shall include Federal, State and local income and franchise taxes upon the Corporation among the deductions in arriving at said net profit. At the time Bush prepared the '62 agreement he was not aware that the Corporation was a Subchapter S corporation. In October of 1964, Bette suffered a stroke and became seriously ill. On January 6, 1965, petitioner *23 advised Bush by telephone that as a result of the stroke Bette had apparently become permanently disabled. Subsequently, in February of 1965, after being discharged from the hospital, Bette visited the Corporation and informed petitioner of his desire to return to work at some future time. Bette had remained a salaried employee up to that point. Shortly thereafter, in February or early March of the same year, petitioner met with Gladys C. Bette to discuss her husband's situation. Petitioner informed her that he would continue to keep Bette on the payroll. He also suggested and agreed to distribute $10,000 to aid her in the payment of medical expenses. On March 15, 1965, the corporation distributed $10,000 each to petitioner and Bette. Such amounts were determined by the district director to be taxable as ordinary income. [3]
*24 In the latter part of March 1965, Samuel S. Sherwood (hereinafter referred to as Sherwood) an attorney representing Bette met with petitioner. Petitioner repeated his offer to keep Bette in the employ of the Corporation. However, Sherwood informed petitioner that Bette would never be able to return to work and therefore he requested that Bette's account with the Corporation be settled. Sherwood also noted that H. H. Manton (hereinafter referred to as Manton) had been retained by Bette to act as accountant on his behalf. Petitioner and Sherwood both agreed that Bette had become permanently disabled on November 1, 1964, and therefore, in compliance with the '62 agreement, April 30, 1965, 6 months after disability, would be the date for Bette's retirement from the business. Following the meeting with Sherwood, petitioner instructed Gassman to determine the amount of Bette's one-half interest in the Corporation as of the April 30 cutoff date, and to review these figures with Manton. Petitioner wanted to be as fair with Bette as possible, dividing everything equally. It was petitioner's understanding that such one-half interest consisted of capital, surplus and earnings for the 4-month *25 period in 1965. In accordance with petitioner's instructions, Gassman computed Bette's interest in the Corporation. His calculations may be reflected as follows: Total Shareholder
Bette's Percentage
Bette's
Interest
Interest
Interest
12/31/61 Surplus
$ 10,798.96
50%
$ 5,399.48
(immediately before Subchapter S election)
12/31/64 Surplus
37,313.99
50%
18,656.99
(1/1/62-12/31/64 surplus while Subchapter S - i.e. previously taxed income)
1/1/65-4/30/65 Corporate Profits
165,821.99
50%
82,910.99
Less 3/15/65 dividend
10,000.00 72,910.99
Total
$ 96,967.46
Gassman met with Manton and as a result it was agreed that the earnings for the 4-month period should be increased to $215,937.95. Therefore Bette's total interest in the Corporation consisted of: 12/31/61 Surplus
$ 5,399.48
12/31/64 Surplus
18,656.99
1965 Profits
$107,968.98
Less 3/15 dividend
10,000.00 97,968.98
Total
$122,025.45
On August 12, 1965, a meeting was held at Bush's office, at which time Gassman and Manton informed the attorneys, Sherwood also being there, of the various figures which represented *26 capital, surplus and net profits as of April 30, 1965, applicable to Bette's interest in the Corporation. After minor adjustments such interest was determined by the parties to total $122,025.46. The parties then proceeded to discuss and agree upon the creation of an escrow agreement wherein Bette and the Corporation would deposit sufficient funds to cover contingent liabilities including New York City and New York State income taxes and a lawsuit pending against the Corporation. Bette's share of the escrow was initially determined to be $18,500. This amount was subsequently increased to $28,198.50. They also discussed the possible inclusion of a reserve for Federal income taxes but rejected such idea on both accountants' explanation that since the Corporation was a Subchapter S corporation the shareholders were individually responsible for such taxes. At the time Manton made the statement in regard to the shareholder responsibility for taxes he was aware that petitioner could very possibly be responsible for all tax on the 1965 earnings. Sherwood, following the August 12 meeting, submitted to Bush a proposed written agreement between the Corporation and Bette. Bush shortly thereafter *27 conveyed to Sherwood a revised draft of that document. On September 2, 1965, a meeting was held at Bush's office wherein the final version of the agreement (hereinafter referred to as the "'65 agreement") was to be executed. Petitioner, Bush, Sherwood, Gassman and Manton were present. Prior to signing petitioner asked those present whether provisions had been made for Federal income taxes. He was informed that since the Corporation was a Subchapter S corporation each party was responsible to satisfy his individual tax liability. The '65 agreement states in pertinent part as follows: AGREEMENT, made this 30th day of August, 1965, among SIDNEY B. BETTE, hereinafter referred to as "Stockholder", BUDD CONTRACTING CORPORATION, hereinafter referred to as the "Corporation", and JULIAN S. BUSH and SAMUEL S. SHERWOOD, hereinafter together referred to as "Escrowees", WITNESSETH: WHEREAS, the Stockholder, the Corporation and Henry H. Renard entered into an agreement dated April 4, 1962, and WHEREAS, paragraph 3 of such agreement provides for the purchase and sale of a disabled stockholder's shares of stock in the corporation, and WHEREAS, it has been determined that the Stockholder *28 became permanently disabled on April 30, 1965 as defined in paragraph 3 of such agreement, and WHEREAS, Alexander Gassman, the accountant for the Corporation has determined the book value of the shares of stock of the Stockholder in the sum of One hundred twenty-two Thousand twenty-five and 46/100 ($122,025.46) Dollars in accordance with the audit prepared by him as of the 30th day of April, 1965, which audit has been approved by Hy Manton, accountant for the Stockholder, and WHEREAS, there is certain litigation pending by Benziger's 51st Street, Inc. against the Corporation and there are certain contingent liabilities against the Corporation for gross receipt taxes and franchise taxes, IT IS THEREFORE AGREED, in consideration of the premises and the promises herein contained, as follows: 1. The Stockholder, pursuant to the agreement of April 4, 1962, will sell his stock to the Corporation and the Corporation will purchase the same. 2. The purchase price to be paid by the Corporation to the Stockholder, pursuant to said agreement, is the sum of $122,025.46, together with certain contingent annual payments for good will, set forth below, payment to be made as follows: (a) *29 $93,826.96 upon the signing of this agreement by a good check of the Corporation payable to the order of the Stockholder. (b) $28,198.50 upon the signing of this agreement by a good check of the Corporation payable to the order of the Stockholder, which check shall be endorsed over by him to the order of the Escrowees. (c) Contingent annual payments to be paid by the Corporation to the Stockholder by good check for a period of three years commencing with the 1st day of May, 1965 equal to 10% of the Corporation's net profits determined as follows: (i) for the eight months ending December 31, 1965 (ii) for the year ending December 31, 1966 (iii) for the year ending December 31, 1967 (iv) for the four months ending April 30, 1968 * * * (e) For the purposes of this agreement the net profits shall mean those certified by the Corporation's accountant from the books of the Corporation which are to be maintained in accordance with generally accepted accounting principal and practises and shall include Federal, State and local income taxes upon the Corporation as deductions in arriving at net profits. * * * 3. The Corporation shall on the signing of this agreement deposit *30 with the Escrowees the sum of $28,198.50. * * * 6. The Stockholder shall deliver to the Corporation simultaneously upon receipt of the payments provided for in paragraph 2(a) and (b), the following: (a) His written resignation as president and director of the Corporation. (b) The written resignation of Gladys Bette as an officer and director of the Corporation. (c) His stock certificate representing 5 shares of the capital stock of the Corporation endorsed by the Stockholder. 7. Immediately after the closing the Corporation will deliver to the Stockholder a certificate of stock for 5 shares of the capital stock of the Corporation with blank stock powers endorsed and attached by delivering the same to Samuel S. Sherwood, to be held by him in escrow for the Stockholder as collateral security until all payments called for in this agreement have been paid in full to the Stockholder at which time such certificate shall be returned forthwith to the Corporation. * * * * * * 8. This agreement is made pursuant to the provisions contained in the agreement of April 4, 1962, hereinbefore mentioned, which agreement is incorporated herein as though set forth at length. Immediately *31 prior to the execution of the '65 agreement--on August 30, 1965--a special stockholders meeting of Budd was called. The minutes of that meeting state in part: Henry H. Renard acted as Chairman of the meeting and advised that Sidney B. Bette having become disabled as defined in paragraph 3 of the Agreement of April 4, 1962, Mr. Beete's stock had been purchased by the corporation pursuant to said Agreement. The Chirman also advised that in view of certain contingent liabilities of the corporation, an escrow agreement had been entered into under which a portion of the purchase price of Mr. Bette's stock as well as matching funds of the corporation, had been posted to secure these liabilities. Upon execution of the '65 agreement Bette surrendered certificate number 4 representing five shares of Budd stock and the Corporation thereupon issued to itself certificate number 5. The stock certificate book on the stub of certificate number five contains the following: Repurchase by Corp. per stockholder contract of 4/4/62. New shares issued for escrow security as per contract. Pursuant to the terms of the '65 agreement the Corporation on September 2, 1965, issued checks numbered 8413 *32 and 8414 in the respective amounts of $93,826.96 and $28,198.50, payable to Bette, and check number 8415 in the amount of $28,198.50, payable to Sherwood and Bush as escrowees. Bette endorsed check number 8414 to the escrowees. The Corporation's books for 1965 reflect the following entries and adjustments: Profit & Loss Debit
Credit
SBB Surplus to 5/30 [4][sic]
$107,968.98
HHR Surplus to 5/30 [4][sic]
107,968.97
HHR Surplus to 6/1 [4][Sic] - 12/31
22,258.42 Deficit or Surplus
Debit
Credit
3/15
$10,000
SBB 4/30
$107,968.98
10,000
20,000.00
HHR
107,968.97
12/31
45,000.00
HHR
22,258.42
SBB 4/30
122,025.46
Budd's Subchapter S return for 1965 reflects taxable income of $238,196. Schedule K of said return "Shareholder's Share of Income" demonstrates the following allocation: Share of undistributed
Ordinary
taxable income
Income
Bette 1/1/65-5/30/65 [5][sic]
$107,969
$107,969
Renard 1/1/65-12/31/65 130,227
130,227
Total
$238,196
$238,196
*33 Petitioner's individual income tax return for 1965 reflects income from Budd of $131,080 [6] and taxable income in the amount of $163,894. In a letter to Bush from Sherwood dated January 28, 1967, Sherwood commenting upon the 1965 transaction stated: My recollection and notes of the original discussion indicate that we provided for all matters which were to be obligations of the corporation and stated that all income matters were to be the obligations of the individuals. The sale of the stock was made with this understanding. The notice of deficiency states in part as follows: Taxable Year Ended December 31, 1965 EXPLANATION OF ADJUSTMENTS (a) It is determined that your share of taxable income of Budd Contracting Corporation, an electing small business corporation, to be reported as ordinary income for the year 1965 is $241,794.00 [7] under the provisions of section 1373 of the Internal Revenue Code. Since you reported $131,080.00 *34 your taxable income is increased by $110,714.00. OPINION This case presents a rather unusual twist on the not uncommon situation where our determination as to the character of a distribution to one party will determine the tax liability of another. The situation here grows out of the provisions of section 1373(a) and (b), which cover, in the following language, the amount to be included in the taxable income of the shareholders of an electing small business corporation: SEC. 1373. CORPORATION UNDISTRIBUTED TAXABLE INCOME TAXED TO SHAREHOLDERS. (a) General Rule.--The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) Amount Included in Gross Income.--Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in *35 his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation. The petitioner was the sole shareholder of Budd on the last day of its taxable year and hence is responsible for including in his return all Budd's undistributed taxable income for, in this case, the year 1965. This being so, we must determine Budd's undistributed taxable income and, consequently, we turn to subsection (c) of section 1373, which provides: SEC. 1373(c). Undistributed Taxable Income Defined.-- For purposes of this section, the term "undistributed taxable income" means taxable income (computed as provided in subsection (d)) minus the sum of (1) the taxes imposed by sections 56 and 1378(a) and (2) the amount of money distributed as dividends during the taxable *36 year, to the extent that any such amount is a distribution out of earnings and profits of the taxable year as specified in section 316(a)(2). Sections 56 and 1378(a) are inapplicable to the present case, leaving us to ascertain whether any amounts have been distributed as dividends during the year in question which could serve to reduce Budd's taxable income. Petitioner contends that a substantial portion, $97,968.98 of the $122,025.46, which was distributed by Budd to Bette on September 2, 1965 was in fact a dividend, representing Bette's one-half share of Budd's earnings for the 4-month period January 1 to April 30, 1965. Respondent, on the other hand, points to the language of the '65 agreement pursuant to which the $122,025.46 was paid and concludes that that language itself requires a determination that the entire amount paid was in fact distributed in redemption of Bette's stock and, as such, cannot serve to reduce the undistributed taxable income of Budd. [8]
*37 It is a fundamental principle of law that in determining the tax consequences of a particular transaction, the substance of such transaction rather than the form is the controlling consideration. Commissioner v. P. G. Lake, Inc., 356 U.S. 260 (1958); Commissioner v. Court Holding Co., 324 U.S. 331 (1945). Similarly, the courts have determined that, though the documents or contracts are significant in ascertaining the realities of a transaction, it is the taxpayer's intent ascertained from all the facts and circumstances which is the determining factor. Wilson Athletic G. Mfg. Co. v. Commissioner, 222 F. 2d 355 (C.A. 7, 1955), reversing a Memorandum Opinion of this Court; Ollie Rose, 56 T.C. 185 (1971); Douglas J. Lemery, 52 T.C. 367 (1969); Arthur A. Ballantine, Jr., 46 T.C. 272 (1966); Eleanor M. Lutz, 45 T.C. 615 (1966). Such fundamental principles have most often been applied in the government's attack upon a transaction created and initiated by the taxpayer. However these basic theories are, in this Court's opinion, equally applicable to the taxpayer. See *38 Casner v. Commissioner, 450 F. 2d 379 (C.A. 5, 1971), affg. in part and revg. in part a decision of the Tax Court; Landa v. Commissioner, 206 F. 2d 431 (C.A. D.C., 1953), remanding a Memorandum Opinion of this Court. An example of the application of these principles on the taxpayer's behalf may be demonstrated in the covenant not to compete versus goodwill area. Therein the courts to a large extent have agreed in essence to rewrite an agreement where the taxpayer can demonstrate by "strong proof" that such agreement did not reflect the true intention of the parties. [9]Balthrope v. Commissioner, 356 F. 2d 28 (C.A. 5, 1966), affg. a Memorandum Opinion of this Court; Montesi v. Commissioner, 340 F. 2d 97 (C.A. 6, 1965), affg. 40 T.C. 511 (1963); Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affg. 29 T.C. 129 (1957); Glenn W. Lucas, Jr., 58 T.C. - (Sept. 26, 1972); Meyer Mittleman, 56 T.C. 171 (1971), affd. per curiam (C.A. 3, Sept. 26, 1972); *39 J. Leonard Schmitz, 51 T.C. 306 (1968).
With this background in mind we turn to the facts of the instant case. The Court accepts the view espoused by petitioner as to the two-pronged character of the September 2 payment. We find as a fact that the representatives of the interested parties attended a meeting some 3 weeks prior to the execution of the '65 agreement to work out the final details. We find that petitioner and Bette were adverse parties, one being the prospective sole shareholder of the buyer and the other being the seller of the stock, and that each was represented by a lawyer and an accountant. Evidence presented as to the understanding of both petitioner and Bette convinces us that each was aware that no reserve was set up to satisfy any federal income tax liability with respect to the January 1-April 30 corporate earnings because each understood that he was personally liable for said taxes due to the Subchapter S election. Such reasoning was consistent with prior years' tax treatment. *40 Each, in short, appreciated the dividend nature of that portion of the distribution. This conclusion is based upon the testimony of petitioner who stated that he specifically raised the question of a reserve for federal taxes, but was informed that such a reserve was unnecessary due to the Subchapter S election; petitioner's accountant who substantiated the above noted testimony; petitioner's lawyer who presented his contemporaneously made notes indicating the understanding of the parties; and a letter written 2 years after the meeting by Bette's lawyer indicating that all parties concerned intended and contemplated the individual shareholder to be responsible for the taxes on the Corporation's 1965 earnings. Extrinsic evidence that the question of income tax liability was considered can be seen from the fact that provision was made for unpaid New York State income taxes as that state has no statute comparable to Subchapter S of the Internal Revenue Code. In further support of the conclusion reached herein we note that the '62 agreement required a determination of the book value of the stock which was to be the price at which a retiring shareholder would sell his stock back to *41 the Corporation. Book value, though not subject to a precise definition, has most generally been defined as assets less liabilities. Re Reben's Will, 115 N.Y.S. 2d 228 (1952); People ex rel. Knickerbocker Fire Ins. Co. v. Coleman, 107 N. Y. 541, 14 N.E. 431 (1887); Financial Handbook (1968 ed.). Decisions promulgated under New York law, the state law applicable in the instant case, in determining the extent of a corporation's liabilities, included accrued tax liability in the computation of book value. Aron v. Gillman, 309 N. Y. 157, 128 N.E. 2d 284 (1955); Re Galewitz Estate, 148 N. Y.S. 2d 823 (1955). It is apparent then, that in the traditional corporate set-up, the non-Subchapter S situation, the $122,025.46 paid to Bette in the instant case would not have represented the book value of 50 percent of the stock as of April 30, 1965 since no provision had been made for the payment of the accrued Federal corporate income taxes. However, in a Subchapter S situation there is no need to reduce the book value by an amount attributable to such corporate taxes, since the tax liability does not lie at that level. Therefore it was perfectly *42 logical for the parties to compute the book value as they did after it was understood that Bette would be liable for the income taxes due on that portion of the $122,025.46 on which no tax had been paid or accrued. We further point out that in arriving at Bette's interest in the Corporation the accountants, following petitioner's instructions, determined the current income for the 4-month period ending April 30, 1965 and divided it equally between the two shareholders. In addition, the corporate books reflect the $122,025.46 paid to Bette as a charge to the surplus account with $107,968.98 of that amount representing Bette's one-half share of income for the 4-month period. Had the parties intended solely a stock redemption the $122,025.46 would have been charged to a treasury stock account. Cf. Gordon A. Erickson, 56 T.C. 1112 (1971). It is also worth noting that the $10,000 payment in March 1965 to each shareholder was treated by all concerned as a dividend. This $10,000 is included in the $107,968.98 figure above and it would seem anomalous in the context of this case to treat it differently from the remaining $97,968.98. It is clear then that the parties were *43 fully conscious of the components of the $122,025.46. Five thousand, three hundred and ninety-nine dollars and fourty-eight cents ($5,399.48) represented one-half of Budd's surplus as of December 31, 1961 (its last pre-Subchapter S year), $18,656.99 represented one-half of the additions to surplus during the Subchapter S years as of December 31, 1964, and $97,968.98 represented the remainder due Bette ($10,000 having been distributed in March) of his one-half share of the January 1-April 30, 1965 earnings. Quite naturally the primary interest of the parties was the precise amount of dollars due Bette and it mattered little, from that point of view, what label was attached to what dollars. What did matter was that all agreed that Bette was entitled to receive, by reason of his one-half stock interest, one-half the 4-month 1965 earnings and, in exchange for his stock, one-half the Corporation's net worth. That these figures were totaled by the parties does not change their understanding of the economic realities of the agreement. Cf. *44 Ragland Investment Co., 52 T.C. 867 (1969), affd. per curiam, 435 F. 2d 118 (C. A. 6, 1970). In support of an opposing view respondent quite appropriately points to the literal language of the '65 agreement pursuant to which the distribution in issue was made. He notes that it provides that "The purchase price to be paid by the Corporation to the Stockholder * * * is the sum of $122,025.46", and concludes from that language that the entire sum must be deemed paid in redemption of Bette's stock. With regard to this contention we need only reiterate the cliche [10] of our profession "substance controls form." As we noted above if a taxpayer can establish by strong proof that an agreement does not contain the parties' true intent it will be modified accordingly. The case for applying the strong proof rule is more cogent here than usual since we have found that the adverse parties to the agreement in question agree, rather than disagree, on what was intended. Further, in this Court's opinion it would be unduly harsh to bind parties to the provisions of an agreement wherein such agreement, due to a mutual mistake of law, does not contain their true intentions. *45 See 3, Pomeroy, Equity Jurisdiction (5th ed.); 13, Williston on Contracts, secs. 1581-1591 (3rd ed.), N. Y. Civ. Prac., sec. 3005 (1963). Lastly, we note that under respondent's view petitioner would include as ordinary income $97,968.98 which he never received, and Bette would include the same dollars, unreduced by the taxes paid with respect to it by petitioner, as a section 302(b)(3) redemption, resulting no doubt in a capital gains tax. Clearly the statute does not necessitate such a result. Respondent further argues, however, that to conclude that the transaction in question is taxable as other than a complete redemption would violate the decisions promulgated in Gordon A. Erickson, supra, and Cummins Diesel Sales Corp. v. United States, 323 F. Supp. 1114 (D.C. S.D. Ind., 1972), affd. per curiam, 459 F. 2d 668 (C.A. 7, 1972). We find respondent's reliance on Erickson misplaced. In Erickson the parties to the transaction intended the complete redemption of the shareholder's stock for a stated consideration with possible adjustments due to an alteration in estimated profits *46 from work currently being completed. The corporate books reflected a debit to treasury stock, signifying a redemption, which entry was subsequently reversed upon the remaining shareholder's discovery of the adverse tax consequences. In the instant case we have accepted the parties' mutual intent, despite their adverse positions, to distribute profits equally with equal tax treatment afforded such profits. Further, the meaning of the agreement here in issue was ambiguous unlike its counterpart in Erickson. We are dealing therefore with a different factual determination with respect to the parties' ultimate desires and intentions. With regard to Cummins Deisel Corp. it is apparent that the District Court was simply faced with the question of the status of dividend arrears on the redemption of preferred stock. It concluded that such arrearages would have no effect on the redemption. In the instant case however we are concerned with the mutual intent of the two parties to a transaction. Such situations are in this Court's opinion distinguishable. Further, in Cummins Diesel the Court was faced with the characterization of a transaction entered into between "related" corporations, while *47 in the instant case we are dealing with a situation involving the mutual understanding of adverse parties. Such a condition further aids in distinguishing the two cases. Having determined that $97,968.98 of the $122,025.46 was intended to be taxable to Bette as a dividend, the undistributed taxable income of Budd for 1965 is reduced by such amount. And petitioner is relieved from any negligence penalty. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Judging from the Corporation's stock record book petitioner and Bette did not hold in their own names any stock in the Corporation until said May 8, 1962.↩
3. We have some question as to respondent's characterization of the distribution as a dividend. Section 1375(f)(1) treats distributions made within 2-1/2 months after the close of the taxable year as distributions from undistributed taxable income of such prior year to the extent of the remaining undistributed taxable income for such year. The distribution in the instant case was made on March 15, 1965, 2-1/2 months after the close of the prior year. The only question therefore is whether Budd had sufficient undistributed taxable income for 1964 to cover all or part of the $20,000 distribution. If such be the case that portion of the distribution would not be taxable as a dividend. Randall N. Clark, 58 T.C. 94↩ (1972).
4. 5/30 date should be 4/30 and 6/1 date should be 5/1; typographical errors were obviously made.↩
5. Supra.↩
6. We do not know why petitioner's share of the income reflected on Schedule K of the Subchapter S return is not identical with the amount of income reported by petitioner on his individual return.↩
7. We also do not know how the Commissioner arrived at the income of Budd Corporation. The return demonstrates a total of $238,196 of income. Respondent does not explain the source of the increase.↩
8. The regulations, specifically section 1.1372-1(d), (e) and (g), note that "dividends paid" does not include a redemption taxable as a sale or exchange under the provisions of section 302(a), and further, such regulations and the applicable case law, Gordon A. Erickson, 56 T.C. 1112↩ (1971), and cases cited therein point out that such redemption does not reduce taxable income in arriving at undistributed taxable income.
9. The Third Circuit applies a more restrictive mistake, undue influence, fraud or duress rule. See Commissioner v. Danielson, 378 F. 2d 771↩ (C.A. 3, 1967).
10. Cliches become such by reason of their timeless verity.↩