T.C. Memo. 1996-286

UNITED STATES TAX COURT

ESTATE OF ROBERT E. CARTWRIGHT, DECEASED, DOROTHY G.
CARTWRIGHT, EXECUTRIX, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 1447-94.                           Filed June 20, 1996.

<u>John M. Youngquist</u> and <u>Donald L. Feurzeig</u>, for petitioner.

<u>Cynthia K. Hustad</u> and <u>Elaine L. Sierra</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined that the Estate of
Robert E. Cartwright (petitioner) had a deficiency in Federal
income tax of $1,142,472 for 1988.

Robert E. Cartwright (decedent) owned 71.43 percent of the
stock of the law firm of Cartwright, Slobodin, Bokelman,
Borowsky, Wartnick, Moore & Harris, Inc. (CSB), a subchapter C

corporation. CSB bought life insurance which paid $5,062,029 to CSB upon decedent's death. CSB paid that amount to decedent's estate. After concessions, the issues for decision are:

1. Whether the life insurance proceeds were paid to decedent's estate solely to redeem his CSB stock, as petitioner contends, or partly for his CSB stock and partly for any claims for cases or work in process, as respondent contends. We hold that $1,105,762 of the payment was for decedent's CSB stock, and the remainder was for any claims for cases or work in process.

2. Whether the part of the payment which was made for any claims for cases or work in process is income in respect of a decedent under section 691. We hold that it is.

Section references are to the Internal Revenue Code in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

At the request of CSB, which request neither party opposed, we sealed parts of the transcript and certain documents which were admitted into evidence.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Dorothy G. Cartwright lived in California when she filed the petition.

A.    <u>Decedent</u>

Decedent was born on July 9, 1925.  He earned his bachelor
of science degree, with honors, from the University of California
at Berkeley in 1948, and his law degree, with honors, from the
Boalt Hall School of Law, University of California in 1951.
Decedent was admitted to practice law in California in 1951.  He
concentrated his practice in personal injury and products
liability law.  He authored articles in professional journals and
coauthored several treatises on products liability law.

B.    <u>Decedent's Law Firm</u>

In 1969, decedent and several others started a law firm.
They incorporated the firm of Cartwright, Saroyan, Martin &
Sucherman, Inc. (CSB),[1] as a professional corporation under
California law.  CSB's office is in San Francisco.  CSB has
always been a subchapter C corporation.  Decedent was CSB's
majority shareholder and chairman of the board until he died.

CSB's shareholders were attorneys licensed to practice law
in California.  A shareholder could sell his shares only to an
existing CSB shareholder unless the other shareholders consented
to a sale.  In the 1973 shareholders' agreement (described in
par. C below), CSB set the price of the stock very low and did

---

[1] The law firm had different names from 1969 to 1988.  It
was named Cartwright, Slobodin, Bokelman, Borowsky, Wartnick,
Moore & Harris, Inc., when decedent died.  We refer to the firm
as CSB even though its name occasionally changed.

not consider its value. This was done to give new shareholders an incentive to stay with the firm and to produce business. Decedent and several other shareholders paid $1 per share. Shareholders who joined CSB after 1973 paid $13 and $15 per share.

CSB specialized in personal injury law. CSB earned contingency fees based on the amount awarded to a client in each case. Under CSB's client contingency fee arrangement,[2] the client paid fees only if money was obtained by settlement or a judgment. CSB advanced the out-of-pocket costs. For cases settled before trial, CSB deducted costs and then took one-third as attorney's fees and gave two-thirds to the client. For cases that went to trial, CSB deducted out-of-pocket costs, took 40 percent as attorney's fees, and gave 60 percent to the client.

CSB paid a salary to each associate and shareholder. CSB did not pay dividends. Each year, CSB distributed any money not needed for operating expenses as bonuses to the associates and shareholders. CSB's shareholders met to decide how much of the profits each shareholder would receive. CSB paid bonuses based on each attorney's contribution to CSB. There was no formula to calculate each shareholder's bonus. Compensation and bonuses were not set based on how many shares each shareholder owned.

---

[2] CSB calculated its contingency fees differently for medical malpractice cases than for other contingency fee cases.

Associates received referral fees but shareholders did not. If an associate brought a case to CSB (i.e., was the "source attorney"), he or she would get 25 percent of CSB's fees after the first $5,000. CSB kept records showing who brought each case to CSB and showing which attorney had a right to receive fees.

C.    CSB's Shareholders Agreement

CSB's shareholders executed a shareholders' agreement (the 1973 agreement) on January 23, 1973. Under the 1973 agreement, CSB agreed to buy a deceased shareholder's interest in CSB and pay the shareholder's widow[3] or estate the following amounts:

1.    The amount the deceased shareholder paid for his stock.

2.    A share of the amount of any earned but unpaid corporate profits or dividends.

3.    The amount of any earned but unpaid salary of the deceased shareholder.

4.    The amount of any incurred expenses or loans unreimbursed to the shareholder.

5.    Twenty-five percent of the net amount received by CSB after the shareholder's death for cases the deceased shareholder brought to CSB.

6.    Ten percent of the net amount CSB received on cases pending when the shareholder died which came to CSB

---

[3] The 1973 agreement uses the term "widow", not "surviving spouse".

because of the CSB firm name or which were brought by an associate.

7. Twenty-five percent of the net amount received during the 3 years after the shareholder's death from business clients who the deceased shareholder brought to CSB.

8. One-half of the proceeds of life insurance bought by CSB on the life of the deceased shareholder to apply towards the amounts listed in 1.-7., above.

Article IV of the 1973 agreement provides for the buyout of the interest of a shareholder who dies, retires, becomes disabled, or is expelled. The 1973 agreement grants a lien to the deceased shareholder's widow for the amount of the percentages listed in the 1973 agreement of fees earned on cases for which the deceased shareholder was entitled to be paid.

Shareholder H. Greig Fowler (Fowler) left CSB in August 1984. Under the 1973 agreement, CSB owed Fowler $31,794 for his share of CSB's retained earnings when he left the firm plus the amount he paid for his stock. CSB and Fowler agreed in October 1986 that CSB would pay him $25,000 for his stock ($25 per share) and for any claims he had against CSB arising out of his employment by CSB. Fowler agreed to reimburse CSB for any client costs it advanced and to pay CSB 25 percent of the net fees he recovered on any case he took with him.

In 1987, shareholder Lowell Sucherman (Sucherman) left CSB. Under the 1973 agreement, CSB owed Sucherman $233,698 for his share of CSB's retained earnings when he left the firm plus the amount he paid for his stock.  CSB offset what it owed Sucherman under the 1973 agreement by the costs it advanced on cases that he took with him and paid him $185,000 (about $46 per share). Sucherman agreed to pay CSB 25 percent of the net fees he recovered on any of the cases he took with him.

D.    The 1988 Amendment Providing Payment for Decedent's Interest in CSB Upon His Death

The shareholders amended the 1973 agreement on January 4, 1988.  The 1988 amendment applied only to decedent.

Decedent's interest in CSB consisted of stock and claims to fees earned on cases he brought to CSB.  Under the 1973 agreement, CSB would have owed a large amount to decedent's estate because decedent had brought more than one-half of the pending cases to CSB when he died.  Decedent wanted to amend the 1973 agreement in 1988 to provide enough funds to maintain his widow's standard of living and to make it easier for CSB to survive his departure.

Under the 1988 amendment, CSB bought two life insurance policies on decedent's life from Prudential Insurance Co. of America (Prudential).  Each policy paid a $2,500,000 death benefit.  CSB paid monthly premiums of $10,000 to $11,000 for the two policies.  CSB owned and was the beneficiary under the

policies. The 1988 amendment stated that the amount of the life insurance proceeds equaled the value of decedent's stock and any claims on behalf of decedent for cases or work in process. It also stated that payment of the insurance proceeds extinguished any claims that decedent or his estate might make against CSB for his interest in CSB and work in process.[4]

E. Decedent's Death

Decedent died on June 30, 1988. No other CSB shareholder had died or retired before decedent. Decedent lived in

---

[4] The 1988 amendment provides in part:

4.c. In the event of the death of Robert E. Cartwright, the proceeds of said policies payable to the Corporation will be exclusively used to purchase and acquire from the estate and heirs of Robert E. Cartwright all of Mr. Cartwright's stock in the Corporation together with any claim to any cases or work in process that may otherwise be made on behalf of Robert E. Cartwright. In this regard, the Corporation agrees to buy all of said stock and Robert E. Cartwright agrees to sell it. The value of said stock and claim in said cases and work in process is hereby fixed as the amount of proceeds of said life insurance policies. Any amounts owed to Mr. Cartwright for unpaid salary or expenses will be additionally paid or reimbursed to his Estate;

* * * * * * *

4.e. All payments from said life insurance proceeds when received shall be deposited in a trust account established for the sole purpose of consummating said purchase and will forthwith be paid to the Estate of Robert E. Cartwright and will constitute full and complete compensation to Robert E. Cartwright, his Estate and heirs of any and all interest in the Corporation and work in process and would therefore, upon payment of such insurance proceeds, extinguish such claims;

California when he died.  His widow, Dorothy G. Cartwright, was appointed executrix of his estate on August 18, 1988.

In June 1988, the following people owned CSB stock:

| Shareholder | Ownership Percentage | Number of Shares |
| --- | --- | --- |
| Robert E. Cartwright | 71.43 | 10,000 |
| Jack L. Slobodin | 10.71 | 1,500 |
| Robert U. Bokelman | 3.57 | 500 |
| Philip Borowsky | 3.57 | 500 |
| Harry F. Wartnick | 3.57 | 500 |
| Michael B. Moore | 3.57 | 500 |
| Lee S. Harris | 3.57 | 500 |
|  | [1]99.99 | 14,000 |

[1] The stipulation does not state why the ownership percentages total only 99.99 percent.

F.   The Estate's Receipt and Tax Treatment of the Life Insurance Proceeds

Prudential paid CSB $5,062,029 from the two life insurance policies.  This amount included the $2,500,000 death benefit under each of the two policies and $62,029 in premium adjustments and interest.

CSB paid $5,062,029 to the estate on December 1, 1988. Sometime after December 31, 1988, CSB filed a Form 1099-MISC with the Internal Revenue Service reporting that it paid $4,080,256 to decedent's estate in 1988 for nonemployee compensation.[5]

_____

[5] Petitioner points out that respondent could have issued a deficiency notice to CSB taking a position inconsistent with respondent's position in this case and, upon CSB's filing a petition in this Court, moved to consolidate the two cases. See Cooney v. Commissioner, 65 T.C. 101, 107-108 (1975) (the Commissioner may take inconsistent positions with different parties to protect the revenue); Foxman v. Commissioner, 41 T.C. 535, 548 (1964), affd. 352 F.2d 466 (3d Cir. 1965).  We note that
(continued...)

On October 12, 1989, petitioner filed a Form 1041, U.S. Fiduciary Income Tax Return, for 1988. Petitioner did not include the insurance proceeds in its taxable income. Petitioner attached a statement to the return which said that the insurance proceeds were consideration for the purchase of decedent's stock in CSB. In the notice of deficiency, respondent determined that $4,080,256 of the payment was compensation and that petitioner has a deficiency of $1,142,472.

OPINION

A.  Whether CSB Paid Life Insurance Proceeds to Decedent's Estate Solely To Redeem His CSB Stock

Petitioner contends that the 1988 amendment fixed the redemption price of decedent's stock at $5 million. Respondent contends that $1,043,733 of the insurance proceeds was paid for decedent's CSB stock and that $3,956,267 was paid for cases or work in process.[6]

We consider the intent of the parties as shown in their written agreements in deciding whether a payment from a

---

[5](...continued)
we are not required to decide this case consistently with respondent's tax treatment of CSB. See Ginsburg v. United States, 184 Ct. Cl. 444, 396 F.2d 983 (1968); Estate of Bette v. Commissioner, T.C. Memo. 1977-404.

[6] Respondent's position assumes that CSB paid $5 million to decedent's estate. CSB paid $5,062,029 to decedent's estate, $62,029 of which was for premium adjustments and interest and is not in dispute. We treat this as respondent's concession that $62,029 (in addition to $1,043,733) was paid to redeem decedent's stock.

corporation to a departing shareholder is to redeem stock or to compensate for services. <u>Steffen v. Commissioner</u>, 69 T.C. 1049, 1052-1053 (1978); <u>Erickson v. Commissioner</u>, 56 T.C. 1112, 1123 (1971); <u>Estate of Bette v. Commissioner</u>, T.C. Memo. 1977-404. In each of those cases, we found that, under the agreement, the payment from the corporation was made solely for the taxpayer's stock. We especially consider a stock price set by the corporation and shareholder if other evidence shows that the price set equals the value of the stock. <u>Smith v. Commissioner</u>, 82 T.C. 705, 715-717 (1984) (we found that the corporation and the shareholder intended for the payment to be solely to redeem the taxpayer's stock). Thus, in deciding whether the $5 million was paid for stock redemption or work in process, or both, we begin by considering what CSB and decedent intended as shown by the 1973 agreement and the 1988 amendment.

The 1973 agreement provided a formula to determine the amount to be paid to decedent's estate, but did not specify the amount. The 1988 amendment fixed the amount of CSB's payment to decedent's estate.

CSB bought $5 million of insurance because decedent believed his widow would need that amount to maintain her standard of living. The purchase of life insurance helped CSB to finance the payment to decedent's estate, helped ensure that CSB would survive decedent's death, eliminated the need to account for

fees earned on cases decedent brought to CSB, and ensured that decedent's widow would receive money promptly after decedent died.

The 1973 agreement stated that a deceased shareholder's estate would be repaid the amount the shareholder paid for CSB stock, and would be paid any earned but unpaid dividends, 25 percent of the net fees CSB received on cases or from business clients the shareholder brought to CSB, and certain other amounts.  The 1988 amendment stated that the insurance payment was both for decedent's stock and for claims for fees earned on cases decedent brought to CSB.

Petitioner argues that the 1988 amendment was a buy-sell agreement that fixed the redemption price of decedent's CSB stock at $5 million.  Petitioner also argues that the parties used the value of CSB's work in process only to measure the payment for decedent's interest in CSB, and that doing so does not convert any of that payment to compensation.

We disagree.  Petitioner's argument overlooks the plain language of the 1988 amendment.  The 1988 amendment plainly requires CSB to use the insurance proceeds to buy "all of * * * [decedent's] stock in the Corporation together with any claim to any cases or work in process that may otherwise be made on behalf of * * * [decedent]."  The 1988 amendment also fixed the value of "said stock and claim in said cases and work in process" as the

amount of the life insurance proceeds. Philip Borowsky testified that the parties intended that the $5 million payment to decedent's estate was both to redeem decedent's CSB stock and to compensate decedent for his work in process. His testimony was consistent with the plain language of the 1988 amendment.

Petitioner contends that CSB and decedent agreed that $5 million was an estimate of the value of decedent's name and reputation, i.e., goodwill, to CSB. We agree that decedent's name and reputation were very valuable to CSB. However, CSB did not pay the $5 million for goodwill; CSB paid it for decedent's stock and any claim to any cases and work in process that might otherwise be made on behalf of decedent.

Petitioner argues that the 1973 agreement and the 1988 amendment, which provide that decedent agrees to sell his interest (in the singular) in CSB, show that the parties meant that the insurance proceeds were paid solely to redeem decedent's CSB stock. We disagree. The 1973 agreement and the 1988 amendment show that CSB and decedent intended that the payment was both for decedent's stock interest and his interest in fees earned on work in process.

We conclude that CSB's payment of the life insurance proceeds to decedent's estate was for both decedent's CSB stock and his claim based on CSB's cases or work in process.

B.    Whether Payments by Corporations to Departing Shareholders Are To Redeem Stock or for Other Purposes

Petitioner relies on several cases in which a corporation made payments to a departing shareholder to redeem the shareholder's stock.  Smith v. Commissioner, supra; Steffen v. Commissioner, supra; Erickson v. Commissioner, supra; Estate of Bette v. Commissioner, supra.  Petitioner contends that these cases require us to hold that CSB's $5 million payment to decedent's estate was entirely for decedent's stock.  We disagree.  In each of these cases, the shareholders and corporation intended the payment to be for stock.  The facts are different here.  Unlike the agreements at issue in those cases, the agreement here provides that the $5 million payment was for both stock and work in process.  Petitioner treats factual findings in those cases as legal holdings and then asks us to find facts here like the facts found in those cases.  We discuss these cases in more detail next.

1.    Smith

In Smith v. Commissioner, supra, the taxpayer sold his stock to two other shareholders.  The stock purchase agreement required the corporation to pay $8,500 to the taxpayer for his stock and $14,750 for commissions.  Id. at 708-709.  Two of the shareholders later agreed to pay $10,000 to the taxpayer for his stock interest.  Id. at 710-711.  The corporation paid the taxpayer $14,974.  Id. at 711, 712 n.5.  The agreement and

the Form 1099 the corporation issued to the taxpayer described the $14,974 payment as commissions.  Id. at 712.  We held that the parties meant for the total payment of $24,974 to be for stock redemption because the taxpayer had no right to receive commissions, the other shareholders intended to use the corporation's income to buy the taxpayer's stock, and the fair market value of the stock was about $25,000.  Id. at 716-717.

Petitioner argues that the amount of insurance CSB bought ($5 million) is evidence of the fair market value of decedent's stock, as in Smith.  We disagree.  CSB bought the insurance policies to pay decedent's estate $5 million for his stock and any claims for cases or work in process.  CSB and decedent did not choose the amount of the insurance policies because it was the fair market value of decedent's stock; they chose it as a price for both decedent's stock and any claim for cases or work in process.

2.   Steffen

In Steffen v. Commissioner, 69 T.C. 1049 (1978), a medical corporation paid $40,000 to redeem the stock of one of its shareholders.  Id. at 1049.  In setting that price, the corporation considered the value of its accounts receivable. Id. at 1051.  Despite that fact, we held that none of the payment was compensation; we held that the $40,000 was paid solely for the taxpayer's stock.  Id. at 1053.

Petitioner argues that, like the accounts receivable in Steffen, the source-attorney fees provision in the 1973 agreement was a financing arrangement by which future CSB fees would be used to redeem a retiring or deceased shareholder's stock. We disagree. The $5 million payment was for both decedent's CSB stock and any claims for work in process; in Steffen, we found that the corporation paid the taxpayer solely for his stock. Unlike Steffen, CSB and decedent did not intend to measure the value of decedent's CSB stock solely by the amount of the insurance payment.

### 3. Erickson and Estate of Bette

Petitioner relies on Erickson v. Commissioner, 56 T.C. at 1123-1124, and Estate of Bette v. Commissioner, T.C. Memo. 1977-404, because in those cases the parties to stock redemption agreements included unpaid profits in measuring the value of the stock. Petitioner's reliance is misplaced. Unlike the agreement in the instant case, the written agreements in Erickson and Estate of Bette were solely stock redemption agreements. Here, as we have stated, the agreement provided for payment not only to redeem stock, but also for any claims to cases or work in process.

## C. CSB's Ownership of Work in Process

Petitioner asserts that, under California law, work in process is a corporate asset and that shareholders do not own

corporate assets such as work in process. Union Bank v. Anderson, 232 Cal. App. 3d 941, 950, 283 Cal. Rptr. 823, 827 (Ct. App. 1991); see Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). Petitioner argues that decedent could not sell work in process on cases he brought to CSB, and, thus, he sold only his CSB stock.

Petitioner's argument misses the mark. Respondent does not dispute that work in process is a corporate asset or contend that decedent sold work in process. Rather, respondent points out, and we have found, that decedent and CSB agreed that CSB paid $5 million in insurance proceeds both for CSB stock and for any claim he had to work in process.

Petitioner points out that Sucherman and Fowler agreed to pay CSB 25 percent of net fees they received on cases they took when they left CSB. Petitioner argues that their agreement to pay fees to CSB shows that the CSB shareholders did not own an interest in the fees paid on work in process. Petitioner's argument misses the point. The 1973 agreement requires a departing shareholder who takes any cases to pay to CSB 25 percent of the net fees received from those cases. The fact that Sucherman and Fowler did so is irrelevant to deciding the character of the $5 million payment to decedent's estate.

D.   Whether the Fact That CSB Was the Beneficiary Under the Life Insurance Policies Determines Whether the Payments to Decedent's Estate Were To Redeem Stock or for Work in Process

Petitioner argues that, under section 20.2031-2(f)(2), Estate Tax Regs.,[7] Estate of Huntsman v. Commissioner, 66 T.C. 861, 875 (1976), and Estate of Clarke v. Commissioner, T.C. Memo. 1976-328, the $5 million in life insurance proceeds was a nonoperating asset of CSB because CSB owned the policies. Petitioner contends that we should include the insurance proceeds as a CSB asset in valuing decedent's stock.

We disagree.  First, the fact that CSB was the beneficiary under the insurance policies does not show whether the parties agreed for the payment to be for stock and for any claim based on work in process.  Second, payments to a shareholder/employee are not necessarily made to redeem stock merely because the corporation owns property which was paid to the shareholder/employee.  Third, the insurance proceeds do not

_____

[7] Sec. 20.2031-2(f)(2), Estate Tax Regs., provides that, in valuing stock where actual sales prices and bid and asked prices are unavailable, the IRS considers the corporation's net worth, prospective earning power, and dividend-paying capacity.  The regulations state that other factors are also considered, such as nonoperating assets, including life insurance policies payable to or for the benefit of the corporation, to the extent that the nonoperating assets have not been taken into account in calculating net worth, prospective earning power, and dividend-earning capacity.

affect the value of decedent's stock because the entire proceeds were paid to decedent's estate.

Petitioner contends that the buy-sell provision in the 1988 amendment established the value of decedent's stock. Sec. 20.2031-2(h), Estate Tax Regs. We disagree. The 1988 amendment fixed the value of decedent's stock and his claim to cases or work in process.

Petitioner points out that in Estate of Huntsman and Estate of Clarke we treated insurance proceeds payable to the corporation as a corporate asset. Petitioner's reliance on those cases is misplaced. In Estate of Huntsman, life insurance proceeds were paid to two corporations under a stock redemption agreement. The corporations used 43 percent of the proceeds to redeem a portion of the stock of both corporations from the sole shareholder's estate, used 32 percent for working capital, and kept 25 percent to finance possible additional stock redemptions from the deceased shareholder's estate. In valuing the stock, we considered the fact that the corporations had a strong cash position because at least one-third of the insurance proceeds could be used for working capital. Estate of Huntsman v. Commissioner, supra at 874-875.

Unlike the corporation in Estate of Huntsman, CSB paid all of the insurance proceeds to decedent's estate; none of the proceeds could be used as working capital. We said in Estate of

Huntsman that a buyer would not pay more for stock based on the corporation's ownership of life insurance if the proceeds would be largely offset by the corporation's liabilities.  Id. at 875.  That is the case here.

In Estate of Clarke v. Commissioner, supra, we held that, in valuing the stock of a corporation, the taxpayer's experts' erred in not including the insurance policy on the life of the deceased taxpayer under which $39,675 was paid to the corporation.

In Estate of Clarke, the corporation was not required to pay the proceeds to the taxpayer's estate.  In contrast, in the instant case, the life insurance proceeds were paid to the corporation, but they could not be used for working capital because they were to be paid to decedent's estate.

We conclude that the $5 million insurance proceeds do not increase the value of decedent's CSB stock.  We also conclude that the fact that CSB was the beneficiary of and owned the insurance proceeds does not determine whether CSB and decedent agreed that payment was made solely to redeem his stock, as petitioner contends, or partly to redeem his stock and partly for any claim for cases or work in process, as we have found.

E.   The Value of Decedent's CSB Stock on June 30, 1988
     Petitioner contends that decedent's stock was worth $5,556,615[8] when he died on June 30, 1988.  Respondent contends

---

[8] Petitioner computes the value of decedent's stock as
(continued...)

that decedent's stock was worth $1,043,733[9] on that date.
Respondent subtracted $1,043,733 from the $5 million in insurance
proceeds CSB paid to decedent's estate to calculate how much of
the insurance payment was not for his stock.  We agree with
respondent because respondent's position is more consistent with
both the stock redemption price stated in the 1973 agreement and
the value of CSB stock independent of that agreement.

Petitioner and respondent each called expert witnesses to
give their opinions about the value of decedent's CSB stock.
Expert opinions can aid the Court in understanding an area
requiring specialized training, knowledge, or judgment.  However,
as the trier of fact, the Court is not bound by the experts'
opinions.  Helvering v. National Grocery Co., 304 U.S. 282, 295
(1938).  The opinions of expert witnesses are weighed according
to their qualifications and other relevant evidence.  Anderson v.

---

[8](...continued)
follows:

| | |
|---|---|
| CSB retained earnings | $1,087,799 |
| Present value of advanced client costs | 676,641 |
| Insurance proceeds | 5,000,000 |
| | 6,764,440 |
| Decedent's 71.43 percent share | 4,831,839 |
| 15-percent control premium | 724,776 |
| Value of decedent's CSB stock | 5,556,615 |

[9] We add $62,029 to that amount for premium adjustments and
interest which were not in dispute.  See supra note 6.

Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; Johnson v. Commissioner, 85 T.C. 469, 477 (1985).

Respondent's expert was Herbert T. Spiro (Spiro). On September 11, 1992, Spiro estimated that decedent's 71.43-interest in CSB was worth $907,594 ($897,594 plus the $10,000 that decedent paid for the stock). Respondent hired Spiro to prepare the appraisal during respondent's audit of CSB's 1988 tax return.

Petitioner's expert was Alan W. Johnson (Johnson). He estimated that CSB stock was worth $5,200,000 and that decedent's 71.43 percent of that stock was worth $3,714,000.

1. Respondent's Expert's Analysis and the 1973 Agreement

The $5 million payment was in lieu of the payment decedent's estate would have received under the 1973 agreement. The 1988 amendment said that the $5 million payment was for both stock redemption and work in process. The 1988 amendment did not specify how much of the $5 million was for stock redemption and how much was for work in process. The 1988 amendment changed how the 1973 agreement was to be implemented by providing for the use of insurance proceeds but did not change the fact that the payment was for stock and any claims to cases or work in process. Thus, to decide how much of the $5 million payment was for decedent's stock and how much was for work in process, we will

consider how much CSB would have paid to decedent's estate for those amounts under the 1973 agreement.

Petitioner does not dispute the appropriateness of using a redemption price established by the parties but argues that the agreed redemption price was $5 million. We disagree because, as we found above, the $5 million payment was for both stock redemption and any claims for work in process.

Respondent's expert properly considered the 1973 agreement and the 1988 amendment. In contrast, petitioner's expert disregarded the agreements.

Spiro concluded that, on June 30, 1988, CSB had retained earnings of $592,233 and undistributed pretax earnings of $1,109,883, of which $665,398 was available to distribute to the shareholders after paying Federal and State corporate income taxes. Spiro added retained earnings and undistributed pretax earnings available for distribution after paying taxes for total retained earnings for CSB of $1,256,631.[10] Spiro multiplied $1,256,631 by decedent's 71.43 percent interest in CSB ($897,594) and added decedent's $10,000 basis in his stock. He concluded that the value of decedent's shares was $907,594. Thus, under the 1973 agreement, CSB would have redeemed decedent's CSB stock

[10] Petitioner's expert calculated that CSB had a lower amount of retained earnings of $1,087,799. We apply respondent's expert's calculation of retained earnings because it is more favorable to petitioner.

for $907,594, consisting of:  (a) $10,000 that decedent paid for the stock, and (b) $897,594, decedent's pro rata share of CSB's earned but unpaid profits.

Spiro also applied a 15-percent control premium.  He concluded that the value of decedent's CSB stock was $1,043,733.

Under the 1973 agreement, not more than 19 percent of CSB's payment to decedent's estate would have been for decedent's CSB stock, and at least 81 percent would have been for his work in process.  If we apply those percentages to the $5 million payment, not more than $950,000 of the $5 million insurance proceeds was paid for decedent's CSB stock, and at least $4,050,000 was paid for his work in process.  This analysis justifies respondent's position that only $1,105,762 was paid to redeem decedent's stock.

Petitioner argues that part of Spiro's report was inadmissible because it included his legal opinion about the meaning of the 1973 agreement and the 1988 amendment.  Petitioner is sounding a false alarm.  We do not consider Spiro's legal opinions in deciding this case.  Aguilar v. International Longshoremen's Union Local #10, 966 F.2d 443, 447 (9th Cir. 1992); Marx v. Diners' Club, Inc., 550 F.2d 505, 509 (2d Cir. 1977).  However, it is appropriate that Spiro disclose the assumptions he made about the rights of CSB and decedent under the 1973 agreement and the 1988 amendment.  Knowing his

assumptions helps us to evaluate his conclusions. We agree with his assumptions and believe he used the proper analysis to value decedent's CSB stock.

Petitioner points out that Spiro did not include CSB's work in process on contingent fee cases as a CSB asset in valuing decedent's CSB stock and contends that Spiro incorrectly assumed that the shareholders, not CSB, owned the work in process. We disagree for the reasons stated above in paragraphs C and D.

Petitioner contends that Spiro mistakenly failed to consider client costs advanced by CSB in contingent fee cases as a CSB asset. Ithaca Trust Co. v. United States, 279 U.S. 151 (1929); Estate of Van Horne v. Commissioner, 78 T.C. 735 (1982), affd. 720 F.2d 1114 (9th Cir. 1983); Estate of Curry v. Commissioner, 74 T.C. 540, 546-547 (1980) (contingent legal fees, by virtue of their contingency, are not automatically excluded from the gross estate; rather, the contingent nature of the contract bears on the factual question of valuation). We disagree. Spiro's exclusion of advanced client costs was proper because he estimated the value of decedent's CSB stock under the stock redemption provisions of the 1973 agreement and the 1988 amendment.

Finally, petitioner contends that Spiro erred in concluding that the shareholders' agreement was followed in the past when shareholders withdrew from CSB, and points out that Mr. Borowsky

testified that shareholders who had left CSB before decedent died were not paid based on the shareholders' agreement but were paid on an ad hoc basis. We do not so find based on the record here relating to the departures of Fowler and Sucherman from CSB.

2. Petitioner's Expert

As stated above, petitioner's expert, Johnson, appraised CSB at $5,200,000 and decedent's 71.43-percent interest in CSB at $3,714,000.

Johnson used four valuation approaches to estimate the value of CSB:

| Valuation Method | Estimated Value |
| --- | --- |
| Adjusted book value | $5,607,000 |
| Discounted discretionary cash-flow | 5,209,000 |
| Excess earnings analysis | 4,520,000 |
| 55% rule of thumb | 4,789,000 |
| 60% rule of thumb | 5,125,000 |

To apply the adjusted book value method, Johnson considered two assets not included in CSB's books: (a) CSB's reimbursable client expenses; i.e., out-of-pocket costs advanced by CSB in contingency fee cases that are reimbursed when the client receives a settlement or judgment award, and (b) CSB's work in process on its contingent fee cases. Johnson concluded that CSB should treat its reimbursable client expenses as an asset

because, historically,[11] 80 percent of those costs had been reimbursed to CSB, usually within 2 years. He added as an asset of CSB a discounted present value of these costs of $676,641. He estimated that the June 30, 1988, value of CSB's work in process on contingent fee cases was $3,842,143.

Johnson also used the discounted discretionary cash-flow (DDCF) method. He considered expenses (other than compensation) incurred during the 5-year period before June 30, 1988, in deciding how to reduce net fees. He estimated that base compensation had historically been about 30 percent of CSB's net fees. He estimated the amount of discretionary cash available to CSB over a 5-year period beginning in 1989, and he used as a discount the rate of return on 30-year Treasury bonds. He estimated the residual value by capitalizing the estimated 1993 cash-flow (which he assumed would continue in perpetuity) at 25 percent. He calculated that the present value was 15 percent to estimate the value of CSB.

Generally, use of the DDCF method requires assumptions to be made about future revenue, operating costs, and practice trends to estimate the present value of future discretionary cash-flow and the future value of the corporation. Johnson, however, used actual CSB financial data for June 30, 1988, to December 31,

---

[11] Johnson concluded by considering data for years through 1991 that CSB had been reimbursed 80 percent of client costs.

1992.  For 1993, Johnson used the average of CSB's data for 1991 and 1992.  Using the DDCF method, he valued CSB at $5,209,000 as of June 30, 1988.

Johnson also analyzed CSB's excess earnings.  Johnson admitted that this method is less reliable than the DDCF method. He adjusted CSB's net income for 1987 and 1988 to normalize the compensation paid to its attorneys to that paid by comparable law practices, assumed CSB had a 12-percent return on equity, and capitalized the result at 25 percent for goodwill value.  He then added goodwill to the 1987 and 1988 book (net equity) values. Using this method, he concluded that CSB was worth $4,525,009 in 1987 and $4,520,143 in 1988.

Johnson applied two versions of a "rule of thumb" for valuing CSB stock.  He applied a rule of thumb which assumes that a firm is worth what it owns plus what it earns.  Pratt, Valuing Small Businesses and Professional Practices 188-189 (1986). Johnson admitted that this method is less reliable than the DDCF method.  He started with book value as of June 30, 1988.  He added a goodwill element of 55 percent of CSB's average fees for the 2 years before 1988 and estimated that the value of CSB was $4,788,624.  For comparison, he also added a goodwill element of 60 percent of CSB's average fees for the 2 years before 1988 and estimated that CSB was worth $5,125,062.

Johnson concluded that CSB was worth $5,200,000 on June 30, 1988; 71.43 percent of that amount is $3,714,000. Johnson said that use of a control premium of 15 percent to value decedent's CSB stock would be appropriate, but he said that he took a more conservative approach and did not apply a control premium. Johnson said that by not applying a premium he might be understating the value of decedent's stock. Johnson estimated that, if he used a 15-percent control premium to value decedent's stock, the value would be $4,217,000. Petitioner contends that a 25-percent control premium should have been used, which would increase the value of decedent's stock to $4,642,500.

Contrary to Johnson's conclusion, we do not think a hypothetical willing buyer would pay anything close to $5 million for decedent's CSB stock. CSB did not pay dividends. Decedent could not sell his CSB stock without the other shareholders' consent. Ownership of CSB stock did not entitle the shareholder to any CSB earnings or profits. There was no relationship between stock ownership in CSB and compensation. Also, the nature of CSB's personal injury contingency fee practice was uncertain.

Prior sales of CSB stock by Fowler and Sucherman suggest that decedent's stock was worth less than $1,105,762 (about $110 per share). CSB agreed to pay $25 per share to Fowler and $46 per share to Sucherman (after offsetting for the costs advanced

by CSB on cases Sucherman took with him from CSB). Johnson concluded that decedent's stock was worth more than $500 per share, more than 10 times the value of Sucherman's stock a year earlier. The record does not support a finding that decedent's stock was worth 10 times as much per share as Sucherman's stock.

Petitioner argues that we should use a 25-percent control premium to value decedent's CSB stock, citing Estate of Salsbury v. Commissioner, T.C. Memo. 1975-333 (38.1-percent control premium applied in valuing a decedent's 51.8-percent stock interest in corporation where the decedent controlled the corporation, including the ability to elect himself president of the corporation, to declare dividends, and to set his own compensation). Johnson said a 15-percent control premium would not be improper, although he did not apply one. Spiro testified that a 15-percent control premium was appropriate. We accept the conclusion of the experts that a 15-percent control premium is appropriate here. Adjusting for a control premium, we find that the value of decedent's stock was $1,105,762.

3. Conclusion

The record amply supports finding a value for decedent's CSB stock equal to or less than that determined by respondent. Thus, using Spiro's appraisal method, we value decedent's CSB stock as follows:

Decedent's initial stock investment                                   $10,000
Amount of earned but unpaid profits
    as of June 30, 1988                          1,256,631

| | |
|---|---:|
| Multiplied by decedent's interest in CSB | <u>71.43%</u> |
| Decedent's pro rata share of CSB's earned but unpaid profits | <u>897,594</u> |
| | 907,594 |
| 15-percent control premium | 136,139 |
| Respondent's concession (see <u>supra</u> n.6) | <u>62,029</u> |
| Value of decedent's CSB stock | 1,105,762 |

F.    <u>Income in Respect of a Decedent</u>

Section 691(a)(1)(A) provides, in pertinent part, as follows:

> SEC. 691(a).  Inclusion in Gross Income.
>
> (1) General Rule.--The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period * * * shall be included in the gross income, for the taxable year when received, of:
>
> (A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;

Section 691 and its predecessor, section 126 of the Internal Revenue Code of 1939, were enacted to accomplish the general purpose of the Internal Revenue Code that a tax should be paid on all income and "that death should not rob the United States of the revenue which otherwise it would have had."  <u>Linde v. Commissioner</u>, 213 F.2d 1, 5 (9th Cir. 1954), remanding 17 T.C. 584 (1951).

The statute does not define the term "income in respect of a decedent".  Section 1.691(a)-1(b), Income Tax Regs., provides:

> (b) General definition.  In general, the term "income in respect of a decedent" refers to those amounts to which a decedent was entitled as gross income but which were not properly includible in computing his taxable income for the taxable year ending with the date of his death * * *.

Petitioner argues that the $5 million payment to decedent's estate is not income in respect of a decedent under section 691.  Petitioner's position parallels petitioner's contention (rejected above) that the $5 million payment was made exclusively to buy decedent's CSB stock.

Respondent concedes that the payment to decedent's estate is not income in respect of a decedent to the extent that it was paid to buy decedent's stock.  Thus, we need decide only whether the $3,956,267 CSB paid to decedent's estate in lieu of any claim for work in process is income in respect of a decedent.

Petitioner contends that there is no income in respect of a decedent from the sale of stock to the corporation when the shareholder dies because the sale occurs after the shareholder's death.  See sec. 1.691(a)-2(b), Example (4), Income Tax Regs.  Petitioner argues that none of the CSB payment to decedent's estate is taxable to petitioner as income in respect of a decedent because:  (1) CSB's shareholders had no right to earnings beyond salary or to bonuses until yearend when the officers decided how to divide CSB's profits; (2) CSB paid

referral fees only to outside attorneys and associates, not to CSB shareholders; and (3) CSB owned its cases and work in process.

Petitioner's arguments do not take into account the fact that the payment to decedent's estate was set at $5 million pursuant to a written agreement between CSB and decedent and was made because decedent performed services for CSB, such as bringing cases to CSB. CSB's ownership of work in process, the rights of other CSB shareholders, and CSB's practices regarding the payment of referral fees are not dispositive of whether any part of the $5 million payment was income in respect of a decedent.

The $5 million payment from CSB was income in respect of a decedent (to the extent it was not payment for decedent's CSB stock) because it was attributable to personal services decedent provided to CSB and was payable on his death. Estate of Bausch v. Commissioner, 186 F.2d 313, 314 (2d Cir. 1951) (payments made voluntarily by a corporation to decedents' estates upon their deaths in recognition of services to the corporation are income in respect of a decedent), affg. 14 T.C. 1433 (1950); Collins v. United States, 318 F. Supp. 382, 389 (C.D. Cal. 1970) (payments made pursuant to a written agreement for 5 years to the wife of a deceased employee of a company were income in respect of a decedent because the decedent bargained for those payments in exchange for his services), affd. per curiam 448 F.2d 787 (9th

Cir. 1971).  CSB agreed to pay insurance proceeds to decedent's estate because he performed valuable services for CSB such as bringing cases and clients to CSB.  A payment for or in recognition of a decedent's services made after the death of a decedent to his or her estate may be income in respect of a decedent even if the decedent had no enforceable right to receive the payment at the date of death.  <u>Estate of Bausch v. Commissioner</u>, <u>supra</u>; <u>Estate of Daniel v. Commissioner</u>, 173 F.2d 966 (2d Cir. 1949) (bonus awarded after the decedent died), affg. 10 T.C. 631 (1948).

Petitioner argues that petitioner was entitled to a stepped-up basis of $5 million in decedent's stock.  Sec. 1014(b)(6). We disagree.  The basis of property in the hands of a person acquiring the property from a decedent is generally its fair market value at the date of the decedent's death.  Sec. 1014(a). However, section 1014 does not apply to "property which constitutes a right to receive an item of income in respect of a decedent under section 691."  Sec. 1014(c).  Thus, section 1014 does not apply to CSB's payment to decedent's estate to the extent it is income in respect of a decedent.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.